Chief Judge Breitel.
Plaintiff Fred F. French Investing Co., purchase money mortgagee of Tudor City, a Manhattan residential complex, brought this action to declare unconstitutional a 1972 amendment to the New York City Zoning Resolution and seeks compensation as for "inverse” taking by eminent domain. The amendment purported to create a "Special Park District”, and rezoned two private parks in the Tudor City complex exclusively as parks open to the public. It further provided for the granting to the defendant property owners of transferable development (air) rights usable elsewhere. It created the transferable rights by severing the above-surface development rights from the surface development rights, a device of recent invention.
Special Term, in a studied and painstaking opinion, declared the amendment unconstitutional and restored the former zoning classification, R-10, permitting residential and office building development. The Appellate Division unanimously affirmed, without opinion. By its appeal, the city seeks review of the declaration of unconstitutionality and the denial of its summary judgment motion on the issue of damages. By their cross appeals, plaintiff mortgagee and defendants, owners and mortgage interest guarantor, seek review of the denial of their summary judgment motions for compensation based on an "inverse” taking.
The issue is whether the rezoning of buildable private parks exclusively as parks open to the public, thereby prohibiting all *591 reasonable income productive or other private use of the property, constitutes a deprivation of property rights without due process of law in violation of constitutional limitations.
There should be an affirmance. While the police power of the State to regulate the use of private property by zoning is broad indeed, it is not unlimited. The State may not, under the guise of regulation by zoning, deprive the owner of the reasonable income productive or other private use of his property and thus destroy all but a bare residue of its economic value. Such an exercise of the police power would be void as violative of the due process clauses of the State and Federal Constitutions (NY Const, art I, § 6; US Const, 14th Arndt, § 1). In the instant case, the city has, despite the severance of above-surface development rights, by rezoning private parks exclusively as parks open to the public, deprived the owners of the reasonable income productive or other private use of their property. The attempted severance of the development rights with uncertain and contingent market value did not adequately preserve those rights. Hence, the 1972 zoning amendment is violative of constitutional limitations.
Tudor City is a four-acre residential complex built on an elevated level above East 42nd Street, across First Avenue from the United Nations in mid-town Manhattan. Planned and developed as a residential community, Tudor City consists of 10 large apartment buildings housing approximately 8,000 people, a hotel, four brownstone buildings, and two 15,000 square-foot private parks. The parks, covering about 18Vi% of the area of the complex, are elevated from grade and located on the north and south sides of East 42nd Street, with a connecting viaduct.
On September 30, 1970, plaintiff sold the Tudor City complex to defendant Ramsgate Properties for $36,000,000. In addition to cash, plaintiff took back eight purchase money mortgages, two of which covered in part the two parks. Payment of the mortgage interest for three years was personally guaranteed by defendant Helmsley. Ramsgate thereafter conveyed, subject to plaintiff’s mortgages, properties including the north and south parks to defendants, North Assemblage Co. and South Assemblage Co. Each of the mortgages secured in part by the parks has been in default since December 7, 1972.
Soon after acquiring the Tudor City property, the new *592 owner announced plans to erect a building, said to be a 50-story tower, over East 42nd Street between First and Second Avenues. This plan would have required New York City Planning Commission approval of a shifting of development rights from the parks to the proposed adjoining site and a corresponding zoning change. Alternatively, the owner proposed to erect on each of the Tudor City park sites a building of maximum size permitted by the existing zoning regulations.
There was immediately an adverse public reaction to the owner’s proposals, especially from Tudor City residents. After public hearings, the City Planning Commission recommended, over the dissent of one commissioner, and on December 7, 1972 the Board of Estimate approved, an amendment to the zoning resolution establishing Special Park District "P”. By contemporaneous amendment to the zoning map, the two Tudor City parks were included within Special Park District
Under the zoning amendment, "only passive recreational uses are permitted” in the Special Park District and improvements are limited to "structures incidental to passive recreational use”. When the Special Park District would be mapped, the parks are required to be open daily to the public between 6:00 a.m. and 10:00 p.m.
The zoning amendment permits the transfer of development rights from a privately owned lot zoned as a Special Park District, denominated a "granting lot”, to other areas in midtown Manhattan, bounded by 60th Street, Third Avenue, 38th Street and Eighth Avenue, denominated "receiving lots”. Lots eligible to be receiving lots are those with a minimum lot size of 30,000 square feet and zoned to permit development at the maximum commercial density. The owner of a granting lot would be permitted to transfer part of his development rights to any eligible receiving lot, thereby increasing its maximum floor area up to 10%. Further increase in the receiving lot’s floor area, limited to 20% of the maximum commercial density, is contingent upon a public hearing and approval by the City Planning Commission and the Board of Estimate. Development rights may be transferred by the owner directly to a receiving lot or to an individual or organization for later disposition to a receiving lot. Before development rights may be transferred, however, the Chairman of the City Planning Commission must certify the suitability of a plan for the *593 continuing maintenance, at the owner’s expense, of the granting lot as a park open to the public.
It is notable that the private parks become open to the public upon mapping of the Special Park District,. and the opening does not depend upon the relocation and effective utilization of the transferrable development rights. Indeed, the mapping occurred on December 7, 1972, and the development rights have never been marketed or used.
Plaintiff contends that the rezoning of the parks constitutes a compensable "taking” within the meaning of constitutional limitations.
The power of the State over private property extends from the regulation of its use under the police power to the actual taking of an easement or all or part of the fee under the eminent domain power. The distinction, although definable, between a compensable taking and a noncompensable regulation is not always susceptible of precise demarcation. Generally, as the court stated in Lutheran Church in Amer. v City of New York (35 NY2d 121, 128-129): "[Government interference [with the use of private property] is based on one of two concepts—either the government is acting in its enterprise capacity, where it takes unto itself private resources in use for the common good, or in its arbitral capacity, where it intervenes to straighten out situations in which the citizenry is in conflict over land use or where one person’s use of his land is injurious to others. (Sax, Taking and the Police Power, 74 Yale L. J. 36, 62, 63.) Where government acts in its enterprise capacity, as where it takes land to widen a road, there is a compensable taking. Where government acts in its arbitral capacity, as where it legislates zoning or provides the machinery to enjoin noxious use, there is simply noncompensable regulation.”
As noted above, when the State "takes”, that is appropriates, private property for public use, just compensation must be paid. In contrast, when there is only regulation of the uses of private property, no compensation need be paid. Of course, and this is often the beginning of confusion, a purported "regulation” may impose so onerous a burden on the property regulated that it has, in effect, deprived the owner of the reasonable income productive or other private use of his property and thus has destroyed its economic value. In all but exceptional cases, nevertheless, such a regulation does not constitute a "taking”, and is therefore not compensable, but *594 amounts to a deprivation or frustration of property rights without due process of law and is therefore invalid.
True, many cases have equated an invalid exercise of the regulating zoning power, perhaps only metaphorically, with a "taking” or a "confiscation” of property, terminology appropriate to the eminent domain power and the concomitant right to compensation when it is exercised. Thus, for example, in Arverne Bay Constr. Co. v Thatcher (278 NY 222, 232), the court stated "An ordinance which permanently so restricts the use of property that it cannot be used for any reasonable purpose goes, it is plain, beyond regulation, and must be recognized as a taking of the property.” Similarly, in Pennsylvania Coal Co. v Mahon (260 US 393, 415), a police power and not an eminent domain case, Mr. Justice Holmes stated: "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking” (see, also, e.g., Lutheran Church in Amer. v City of New York, 35 NY2d 121, 129, 132, supra ["confiscatory”]; Matter of Golden v Planning Bd. of Town ofRamapo, 30 NY2d 359, 380, app dsmd 409 US 1003 ["taking”]; Salamar Bldrs. Corp. v Tuttle, 29 NY2d 221, 225 ["taking”]; Vernon Park Realty v City of Mount Vernon, 307 NY 493, 499 ["confiscatory”]).
The metaphor should not be confused with the reality. Close examination of the cases reveals that in none of them, anymore than in the Pennsylvania Coal case (supra), was there an actual "taking” under the eminent domain power, despite the use of the terms "taking” or "confiscatory”. Instead, in each the gravamen of the constitutional challenge to the regulatory measure was that it was an invalid exercise of the police power under the due process clause, and the cases were decided under that rubric (see Arverne Bay Constr. Co. v Thatcher, 278 NY 222, 223, 225, 229, 231, supra; Pennsylvania Coal Co. v Mahon, 260 US 393, 395-396, 414, supra; Lutheran Church in Amer. v City of New York, 35 NY2d 121, 123, 125, 130-131, supra; Matter of Golden v Planning Bd. of Town of Ramapo, 30 NY2d 359, 363-364, 377, supra [due process and equal protection clauses]; Salamar Bldrs. Co. v Tuttle, 29 NY2d 221, 223, 224-225, 226, supra; Vernon Park Realty v City of Mount Vernon, 307 NY 493, 498, 499, supra). As has been cogently pointed out by Professor Costonis: "the goal of [challenges to regulatory measures] in conventional land use disputes is to preclude application of the measure to the restricted parcel on the basis of constitutional infirmity. What *595 is achieved, in short, is declaratory relief. The sole exception to this mild outcome occurs where the challenged measure is either intended to eventuate in actual public ownership of the land or has already caused government to encroach on the land with trespassory consequences that are largely irreversible.” (Costonis, "Fair” Compensation and the Accommodation Power: Antidotes for the Taking Impasse in Land Use Controversies, 1975 Col L Rev 1021, 1035; for examples of the exceptions described see Keystone Assoc, v State of New York, 33 NY2d 848, affg on opn at App Div 39 AD2d 176; Matter of Keystone Assoc. v Moerdler, 19 NY2d 78, 85-86.)
In the present case, while there was a significant diminution in the value of the property, there was no actual appropriation or taking of the parks by title or governmental occupation. The amendment was declared void at Special Term a little over a year after its adoption. There was no physical invasion of the owner’s property; nor was there an assumption by the city of the control or management of the parks. Indeed, the parks served the same function as before the amendment, except that they were now also open to the public. Absent factors of governmental displacement of private ownership, occupation or management, there was no "taking” within the meaning of constitutional limitations (see City of Buffalo v Clement Co., 28 NY2d 241, 255-257). There was, therefore, no right to compensation as for a taking in eminent domain.
Since there was no taking within the meaning of constitutional limitations, plaintiffs remedy, at this stage of the litigation, would be a declaration of the amendment’s invalidity, if that be the case. Thus, it is necessary to determine whether the zoning amendment was a valid exercise of the police power under the due process clauses of the State and Federal Constitutions.
The broad police power of the State to regulate the use of private property is not unlimited. Every enactment under the police power must be reasonable (see, e.g., People v Goodman, 31 NY2d 262, 265-266; Goldblatt v Hempstead, 369 US 590, 594-595). An exercise of the police power to regulate private property by zoning which is unreasonable constitutes a deprivation of property without due process of law (NY Const, art I, § 6; US Const, 14th Arndt, § 1; Vernon Park Realty v City of Mount Vernon, 307 NY 493, 499, supra; Nectow v Cambridge, 277 US 183, 188-189; see 1 Rathkopf, Law of Zoning and Planning [4th ed], § 4.02).
*596 What is an “unreasonable” exercise of the police power depends upon the relevant converging factors. Hence, the facts of each case must be evaluated in order to determine the private and social balance of convenience before the exercise of the power may be condemned as unreasonable (see, e.g., Village of Belle Terre v Boraas, 416 US 1, 4; Euclid v Ambler Co., 272 US 365, 387; Stevens v Town of Huntington, 20 NY2d 352, 355-356).
A zoning ordinance is unreasonable, under traditional police power and due process analysis, if it encroaches on the exercise of private property rights without substantial relation to a legitimate governmental purpose. A legitimate governmental purpose is, of course, one which furthers the public health, safety, morals or general welfare. (See, e.g., Salamar Bldrs. Corp. v Tuttle, 29 NY2d 221, 224-225, supra; People v Scott, 26 NY2d 286, 291; Nectow v Cambridge, 277 US 183, 187-188, supra; Euclid v Ambler Co., supra, at p 397; 1 Rathkopf, op. cit., at pp 4-3, 4-26.) Moreover, a zoning ordinance, on similar police power analysis, is unreasonable if it is arbitrary, that is, if there is no reasonable relation between the end sought to be achieved by the regulation and the means, used to achieve that end (see, e.g., Salamar Bldrs. Corp. v Tuttle, supra, at pp 226-227; Matter of Board of Educ. v City Council of City of Glen Cove, 29 NY2d 681, 682; 1 Rathkopf, op. cit., at pp 4-3, 4-26).
Finally, and it is at this point that the confusion between the police power and the exercise of eminent domain most often occurs, a zoning ordinance is unreasonable if it frustrates the owner in the use of his property, that is, if it renders the property unsuitable for any reasonable income productive or other private use for which it is adapted and thus destroys its economic value, or all but a bare residue of its value (see, e.g., Lutheran Church in Amer. v City of New York, 35 NY2d 121, 130, supra; Vernon Park Realty v City of Mount Vernon, 307 NY 493, 499, supra; Shepard v Village of Skaneateles, 300 NY 115, 118; Arverne Bay Constr. Co. v Thatcher, 278 NY 222, 226, 232, supra; Matter of Eaton v Sweeny, 257 NY 176, 183; 1 Rathkopf, op. cit., § 6.02, at p 6-2).
The ultimate evil of a deprivation of property, or better, a frustration of property rights, under the guise of an exercise of the police power is that it forces the owner to assume the cost of providing a benefit to the public without recoupment. There is no attempt to share the cost of the benefit among those benefited, that is, society at large. Instead, the accident *597 of ownership determines who shall bear the cost initially. Of course, as further consequence, the ultimate economic cost of providing the benefit is hidden from those who in a democratic society are given the power of deciding whether or not they wish to obtain the benefit despite the ultimate economic cost, however initially distributed (Dunham, Legal and Economic Basis for Planning, 58 Col L Rev 650, 665). In other words, the removal from productive use of private property has an ultimate social cost more easily concealed by imposing the cost on the owner alone. When successfully concealed, the public is not likely to have any objection to the "cost-free” benefit.
In this case, the zoning amendment is unreasonable and, therefore, unconstitutional because, without due process of law, it deprives the owner of all his property rights, except the bare title and a dubious future reversion of full use. The amendment renders the park property unsuitable for any reasonable income productive or other private use for which it is adapted and thus destroys its economic value and deprives plaintiff of its security for its mortgages. Indeed, as Rathkopf has characterized it, the case is an "extreme example” of a deprivation (1 Rathkopf, op. cit., at p 6-55; contra Marcus, Mandatory Development Rights Transfer and the Taking Clause: The Case of Manhattan’s Tudor City Parks, 24 Buffalo L Rev 77, 93-94, 105).
It is recognized that the "value” of property is not a concrete or tangible attribute but an abstraction derived from the economic uses to which the property may be put. Thus, the development rights are an essential component of the value of the underlying property because they constitute some of the economic uses to which the property may be put. As such, they are a potentially valuable and even a transferable commodity and may not be disregarded in determining whether the ordinance has destroyed the economic value of the underlying property (cf. Newport Assoc. v Solow, 30 NY2d 263, 268 [concurring opn], cert den 410 US 931).
Of course, the development rights of the parks were not nullified by the city’s action. In an attempt to preserve the rights they were severed from the real property and made transferable to another section of mid-Manhattan in the city, but not to any particular parcel or place. There was thus created floating development rights, utterly unusable until they could be attached to some accommodating real property, *598 available by happenstance of prior ownership, or by grant, purchase, or devise, and subject to the contingent approvals of administrative agencies. In such case, the development rights, disembodied abstractions of man’s ingenuity, float in a limbo until restored to reality by reattachment to tangible real property. Put another way, it is a tolerable abstraction to consider development rights apart from the solid land from which as a matter of zoning law they derive. But severed, the development rights are a double abstraction until they are actually attached to a receiving parcel, yet to be identified, acquired, and subject to the contingent future approvals of administrative agencies, events which may never happen because of the exigencies of the market and the contingencies and exigencies of administrative action. The acceptance of this contingency-ridden arrangement, however, was mandatory under the amendment.
The problem with this arrangement, as Mr. Justice Waltemade so wisely observed at Special Term, is that it fails to assure preservation of the very real economic value of the development rights as they existed when still attached to the underlying property (77 Misc 2d 199, 201). By compelling the owner to enter an unpredictable real estate market to find a suitable receiving lot for the rights, or a purchaser who would then share the same interest in using additional development rights, the amendment renders uncertain and thus severely impairs the value of the development rights before they were severed (see Note, The Unconstitutionality of Transferable Development Rights, 84 Yale LJ 1101, 1110-1111). Hence, when viewed in relation to both the value of the private parks after the amendment, and the value of the development rights detached from the private parks, the amendment destroyed the economic value of the property. It thus constituted a deprivation of property without due process of law.
None of this discussion of the effort to accomplish the highly beneficial purposes of creating additional park land in the teeming city bears any relation to other schemes, variously described as a "development bank” or the "Chicago Plan” (see Costonis, The Chicago Plan: Incentive Zoning and the Preservation of Urban Landmarks, 85 Harv L Rev 574; Costonis, Development Rights Transfer: An Exploratory Essay, 83 Yale LJ 75, 86-87). For under such schemes or variations of them, the owner of the granting parcel may be allowed just compensation for his development rights, instantly and in money, and *599 the acquired development rights are then placed in a "bank” from which enterprisers may for a price purchase development rights to use on land owned by them. Insofar as the owner of the granting parcel is concerned, his development rights are taken by the State, straightforwardly, and he is paid just compensation for them in eminent domain. The appropriating governmental entity recoups its disbursements, when, as, and if it obtains a purchaser for those rights. In contrast, the 1972 zoning amendment short-circuits the double-tracked compensation scheme but to do this leaves the granting parcel’s owner’s development rights in limbo until the day of salvation, if ever it comes.
With respect to damages caused by the unlawful zoning amendment the issue is not properly before the court. The owner never made such an unequivocal claim and still does not. Instead, it claims compensation for value appropriated as for an "inverse” taking in eminent domain. The mortgagees and personal guarantor make parallel claims. That view of the invalid amendment is not adopted for the reasons discussed at length earlier. The city, on the other hand, seeks a declaration with respect to such damages, but in the absence of allegation or proof that such damages lie, are claimed, or how they have been incurred, there can be no abstract declaration, and therefore there is none.
It would be a misreading of the discussion above to conclude that the court is insensitive to the inescapable need for government to devise methods, other than by outright appropriation of the fee, to meet urgent environmental needs of a densely concentrated urban population. It would be equally simplistic to ignore modern recognition of the principle that no property has value except as the community contributes to that value. The obverse of this principle is, therefore, of first significance: no property is an economic island, free from contributing to the welfare of the whole of which it is but a dependent part. The limits are that unfair or disproportionate burdens may not, constitutionally, be placed on single properties or their owners. The possible solutions undoubtedly lie somewhere in the areas of general taxation, assessments for public benefit (but with an expansion of the traditional views with respect to what are assessable public benefits), horizontal eminent domain illustrated by a true "taking” of development rights with corresponding compensation, development banks, *600 and other devices which will insure rudimentary fairness in the allocation of economic burdens.
Solutions must be reached for the problems of modern zoning, urban and rural conservation, and last but not least landmark preservations, whether by particular buildings or historical districts. Unfortunately, the land planners are now only at the beginning of the path to solution. In the process of traversing that path further, new ideas and new standards of constitutional tolerance must and will evolve. It is enough to say that the loose-ended transferable development rights in this case fall short of achieving a fair allocation of economic burden. Even though the development rights have not been nullified, their severance has rendered their value so uncertain and contingent, as to deprive the property owner of their practical usefulness, except under rare and perhaps coincidental circumstances.
The legislative and administrative efforts to solve the zoning and landmark problem in modern society demonstrate the presence of ingenuity (see, e.g., Lutheran Church in Amer. v City of New York, 35 NY2d 121, supra; Newport Assoc. v Solow, 30 NY2d 263, supra; Matter of Golden v Planning Bd. of Town of Ramapo, 30 NY2d 359, supra). That ingenuity further pursued will in all likelihood achieve the goals without placing an impossible or unsuitable burden on the individual property owner, the public fisc, or the general taxpayer. These efforts are entitled to and will undoubtedly receive every encouragement. The task is difficult but not beyond management. The end is essential but the means must nevertheless conform to constitutional standards.
Accordingly, the order of the Appellate Division should be affirmed, without costs, and the certified question answered in the affirmative.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order affirmed, etc.