Jasen, J.
Petitioner, a landowner in the Village of Camillus, planned to construct three apartment buildings, totaling 36 units, on his property. Village law required that such buildings had to be connected to the village sewage system. On May 9, 1972, the village board authorized issuance of a building permit. However, on May 22, 1972, the State Department of Environmental Conservation informed petitioner that he could not connect into the village sewage system until "the Village undertakes a program to correct the deficiencies of their sewage system”. The State likewise directed the Onondaga County Health Department not to authorize the petitioner to connect into the existing system until the present deficiencies were corrected. Thereafter, in June, 1972, petitioner commenced this article 78 proceeding against the State Commissioner of Environmental Conservation, the Deputy Commissioner, Onondaga County Department of Health, and the Village of Camillus, contending that the actions of the State, county and village were arbitrary and capricious, resulting in an unconstitutional appropriation of his property without compensation. Petitioner sought a judgment directing the respondents to approve the sewer connection to his property, requiring the village to take appropriate steps so that *321 the State and county would allow petitioner to use the village sewer system and awarding damages in the amount of $50,000 for damages already sustained. Alternatively, petitioner sought damages in the amount of $100,000 for the appropriation of his property in the event "that sewers are not approved * * * and he is not allowed to build the apartments on his property”.
The sewage treatment problems of the Village of Camillus are long standing, and village sewage has contributed to the pollution of the waters of Nine Mile Creek. In July, 1966, the village and the State Department of Health entered into a consent decree concerning improvement of the village sewage system. However, in April, 1968, the State Department of Health agreed with the village and the County of Onondaga that the village should not proceed with the design of secondary treatment facilities until the results of the Nine Mile Creek portion of a county-wide comprehensive sewage study had been received and evaluated. The department advised the village that any enforcement action on the 1966 consent order would be withheld pending analysis of the results which were expected to be available during June, 1968. However, the department acted in the expectation that, after study of the findings, the village would present the department with a schedule for implementation of the abatement program.
The next development, as indicated by the present record, occurred in October, 1972. The village entered into a new consent order with the State Department of Environmental Conservation, which in the interval had become the State agency responsible for the enforcement of the Water Pollution Control Law. The 1972 order provided a timetable for taking designated remedial steps. One tank of the sewage treatment plant was to be emptied of accumulated sludge and sediment and its baffles were to be repaired or replaced. The village was also to obtain and submit for approval a plan for the elimination of excessive groundwater and stormwater infiltration into the village sewage collection system. The village agreed to file an undertaking in the amount of $10,000 payable to the State commissioner in the event that the village failed to comply with the consent order. In July, 1973, the department found that the village was still discharging sewage and waste effluents into Nine Mile Creek which had not been subjected to effective primary treatment. The village’s attempt to prohibit the State from conducting an administrative enforcement *322 proceeding designed to establish a definite date for abating the discharge of untreated sewage into Nine Mile Creek was unsuccessful. (See Village of Camillus v Diamond, 76 Misc 2d 319, affd 45 AD2d 982, mot for lv to app den 35 NY2d 645, cert den 421 US 931.)
The most recent development took place in March, 1976 when the village and the State entered into another consent order. The order recited the fact that the village had met technical problems in complying with the 1966 and 1972 orders, that the village had co-operated actively with the county in developing regional wastewater facilities, and that the county had completed a plan of study for the construction of regional facilities which would treat wastewater generated within the village. It was also noted that the original schedules were no longer attainable, and that Federal laws had been enacted requiring local compliance with Federal standards. A new schedule was agreed to, whereby the village was to apply for a State/Federal grant for the construction of new facilities with the facilities to be completed and in operation by January 1, 1980.
Special Term dismissed the article 78 proceeding for failure to state a cause of action, but the Appellate Division reversed. (42 AD2d 232.) On remand, Special Term directed the village to proceed immediately to correct the deficiencies in its sewer system and directed the State to issue a permit authorizing a sewer connection to petitioner’s property upon proof of satisfactory compliance by the village. The claim for money damages was dismissed against all respondents. The Appellate Division modified the order of Special Term by "reinstating petitioner’s cause of action for money damages for the alleged taking” and directed an immediate trial on that claim. (47 AD2d 426, 430.)
On this appeal, issues both of substance and procedure are raised. It is useful to first discuss the substantive rights of the respective parties before proceeding to consideration of the proper procedural vehicle for the enforcement of cognizable rights.
At the threshold, we note that this case does not involve the potentially troublesome issue of whether mere failure to provide municipal services can result in an inverse condemnation for which the municipality must pay compensation. Much more is involved here than merely an asserted failure to provide a service due equally to all members of the commu *323 nity. It is, of course, old law that a municipality is under no obligation to furnish sewers to particular property owners. Municipal corporations have ample authority to provide sewers "but it is not their duty to make every sewer or drain which may be desired by individuals, or which a jury might even find to be necessary and proper.” (Wilson v Mayor, 1 Denio 595, 600; accord O’Donnell v City of Syracuse, 184 NY 1; Seifert v City of Brooklyn, 101 NY 136; see 40 NY Jur, Municipal Corporations, § 1023, p 281.) Although municipal sewage disposal obligations have been discussed at great length in the tort realm, and little mentioned elsewhere, it is virtually beyond question that an individual property owner has no right to insist that the municipality provide him with a system, at least where the problem is unique to his land and can be remedied at his expense. (Cf. 45 NY St Dept Rep 666 [Inf Opn of Atty Gen].) Article 14 of the Village Law provides for the optional construction of sewers in a village, with the cost to be borne entirely by the village, entirely by the owners of the property benefited or by the village and the property owners jointly, at the option of the village. It is also old law that once a municipality has acted to provide a sewer and its improvement causes damage, the municipality is liable to compensate for the injuries sustained. (Seifert v City of Brooklyn, 101 NY 136, supra.)
In this case, it is undisputed that the village provided a sewage disposal system and that local law requires that if a sewer is provided, it must be used. Moreover, the local law requires sewer-connected toilet facilities if the property is intended for any human use. The vice of the situation is that the municipality requires the use of public sewers if the property is to be developed for human use and yet has not provided an adequate system for meeting the requirement imposed by the ordinance. Hence, the claim is more than an undifferentiated demand for municipal service due to all citizens equally. The contention, strippéd to its essence, is that the sewer ordinance is being applied unconstitutionally to petitioner’s property, thereby frustrating nearly all reasonable development.
A municipality has ample power to remedy sanitation problems, including difficulties presented by inadequate treatment or disposal of sewage and waste. (Westwood Forest Estates v Village of South Nyack, 23 NY2d 424, 427.) Inadequate systems of sewage disposal present not only ecological and aes *324 thetic problems, but may pose direct and immediate health hazards. The municipal power to act in furtherance of the public health and welfare may justify a moratorium on building permits or sewer attachments which are reasonably limited as to time. (23 NY2d, at pp 428-429; accord Smoke Rise v Washington Suburban Sanitary Comm., 400 F Supp 1369.) Temporary restraints necessary to promote the over-all public interest are permissible. Permanent interference with the reasonable use of private property for the purposes for which it is suited is not. We have held that police power enactments must be reasonable and that unreasonable exercises of the police power result in a deprivation of property without due process. (French Investing Co. v City of New York, 39 NY2d 587, 594-595, app dsmd 429 US 990, and cases cited therein.)
A police power regulation to be reasonable must be kept within the limits of necessity. (Arverne Bay Constr. Co. v Thatcher, 278 NY 222, 230.) In Matter of Belle Harbor Realty Corp. v Kerr (35 NY2d 507), we established a three-pronged test for measuring whether necessity limits have been exceeded. "To justify interference with the beneficial enjoyment of property the municipality must establish that it has acted in response to a dire necessity, that its action is reasonably calculated to alleviate or prevent the crisis condition, and that it is presently taking steps to rectify the problem.” (35 NY2d, at p 512.) In that case, the municipality revoked a building permit on the ground that evidence uncovered since the issuance of the permit revealed that sewers were "grossly inadequate” for present use and new sewer connections were not advisable. The builder contended that the city had not acted because of sewer inadequacy but in response to community opposition to the planned development. We authorized the commencement of a proceeding to determine whether the revocation was a necessary health measure or was, in fact, motivated by political considerations. However, there was no contention that the developer would be entitled to money damages for any delay, whether justified by health requirements or not.
Similarly, in the Westwood case (supra), we struck down a village zoning ordinance that prohibited all apartment house construction. The ordinance was purportedly justified by the fact that the village had inadequate sewage treatment facilities and new multiple dwellings would increase pollution of *325 the Hudson River. Yet the sewage problem was. not caused by the nature of the plaintiff’s land but was general to the community. It was, we concluded, impermissible to single out one landowner to bear a heavy financial burden caused by a general community condition. (23 NY2d, at p 424.) We were careful to note that the village, while it could not blanketly prohibit development, could impose moratoriums or other temporary measures in order to deal with the problem. (23 NY2d, at pp 426, 428-429.) Indeed, we have sustained development restrictions, pursuant to a general community plan, for periods as long as 18 years. (See Matter of Golden v Planning Bd. of Town of Ramapo, 30 NY2d 359, app dsmd 409 US 1003.) However, the crucial factor, perhaps even the decisive one, is whether the ultimate economic cost of the benefit is being shared by the members of the community at large, or, rather, is being hidden from the public by the placement of the entire burden upon particular property owners. (See French Investing Co. v City of New York, 39 NY2d 587, 596-597, supra.)
Petitioner has alleged sufficient facts to create a triable issue as to whether the village sewer ordinance is being applied to his property unconstitutionally. Ultimate constitutionality hinges upon several important and diverse, yet not exclusive, factors. At the trial, it will be relevant to establish the exact nature of the village sewage disposal problem. Only when the problem has been specifically identified can it be determined what steps are necessary to correct the difficulty and at what cost, in terms both of expense and time. (Cf. Berenson v Town of New Castle, 38 NY2d 102.) The capacity of the municipality to raise the necessary capital, either from taxes or by borrowing, is pertinent. (Matter of Golden v Planning Bd. of Town of Ramapo, supra, at pp 377-378.) Attention should be focused on the role of the State and Federal governments. In addition to supplying assistance in raising the necessary funds, both governments likely may have significant supervisory functions. We are, of course, concerned that the village sewer problem first appeared in 1966 and will not be rectified, at the earliest, until 1980. Such a period of delay can be justified only if the remedial steps are of sufficient magnitude to require extensive preparations, including preliminary studies, applications for assistance to other governmental entities, the raising of large amounts of capital, and the letting of work contracts. Performance of the actual construction and repair work may involve substantial *326 periods of time. Construction factors, beyond control of the village, may contribute to delay. (See Matter of Golden v Planning Bd. of Town of Ramapo, supra, at p 382.) Crucial also is the diligence and good faith of municipal officials in pursuing the necessary improvements.
The municipality, as we have said, to sustain an interference with the beneficial enjoyment of property, must establish that the interference is justified by dire necessity, that the governmental restraint is calculated to alleviate or prevent the crisis condition, and steps are presently being undertaken to rectify the situation. (Matter of Belle Harbor Realty Corp. v Kerr, 35 NY2d 507, 512, supra.) Although reasonable excuse may justify delay, the village must be committed firmly to the construction and installation of the necessary improvements. (See Matter of Golden v Planning Bd. of Town of Ramapo, 30 NY2d 359, 382, supra.) Absent the constraints imposed by law or contract, governmental officials may conduct the affairs of government at their own pace. However, where the municipality has affirmatively barred substantially all use of private property pending remedial municipal improvements, unreasonable and dilatory tactics, targeted really to frustrate all private use of property, are not justified. The municipality may not, by withholding the improvements that the municipality has made the necessary prerequisites for development, achieve the result of barring development, a goal that would perhaps be otherwise unreachable. (Cf. Berenson v Town of New Castle, 38 NY2d 102, supra.) Development may not be zoned out of a community by the indirection of needless municipal delay in providing the essentials for construction.
The extent of damage sustained by the individual property owner must, of course, be ascertained. (Cf. Matter of Fulling v Palumbo, 21 NY2d 30.) Mere financial loss is not enough, but the restriction on use must be so great as to deprive the owner of any reasonable use of the property to which any owner would be generally entitled to put the property. (1 Anderson, American Law of Zoning [2d ed], § 3.26.) Much, too, may depend upon when the property owner alerted the government to the particular damage being inflicted upon his property.
It is commonplace that a municipality is vested with discretion in determining whether construction of municipal improvements is necessary, and if so, the form of such improvements, their extent and location. Moreover, the judgment of *327 municipal officials necessarily entails evaluation of relevant budgetary and taxation considerations. Only where the municipality has acted, or refused to act, and the social cost of a benefit has been placed entirely upon particular landowners, rather than spread throughout the jurisdiction, does it become necessary to review discretion and set aside unconstitutional confiscation.
The crux of the matter is that a municipal exercise of the police power which interferes with the beneficial use of property must be a reasonable and legitimate response to a situation which it is within the police power to correct. As the cases have made clear, no single factor, by itself, controls the determination of whether a particular municipal action is reasonable. Just as no single factor is decisive, no set of factors is exclusive. While we have mentioned several considerations that may serve as useful guides, determinations of reasonableness must turn upon the facts and circumstances of particular cases. "What is an 'unreasonable’ exercise of the police power depends upon the relevant converging factors. Hence, the facts of each case must be evaluated in order to determine the private and social balance .of convenience before the exercise of the power may be condemned as unreasonable”. (French Investing Co. v City of New York, 39 NY2d 587, 596, supra.)
In this case, the delay, as measured from the time the difficulty first surfaced, has been substantial. Petitioner has been through a tortured course of litigation and appeal. Yet the reásons, if any, for apparent municipal inactivity in the face of sewage difficulties have never been explained. The present record, even after two appeals to the Appellate Division, is woefully silent. While it is true that the municipality has not submitted any justification for the delay, we also note that the property owner has not submitted any proof, apart from his conclusory allegations, that the municipal delay has exposed him to, or has caused him, significant economic injury of some sort. It is, of course, the property owner that must come forward with such proof in support of the claim that the zoning ordinance is being applied to the property unconstitutionally, in order to put the municipality to the task of justifying its action. (E.g., Arverne Bay Constr. Co. v Thatcher, 278 NY 222, 232-233, supra; 1 Anderson, New York Zoning Law and Practice [2d ed], § 2.09, pp 48-50; see Matter of Overhill Bldg. Co. v Delany, 28 NY2d 449, 454; cf. Matter of *328 Belle Harbor Realty Corp. v Kerr, 35 NY2d 507, supra.) On this inadequate record, it would be inappropriate for us to determine the constitutionality of the municipal action. Both parties have not submitted the proof necessary for an intelligent and conclusive judicial evaluation of their respective claims. Since the parties should be given an opportunity, which neither has yet had, to submit their proof on trial, any temporary relief, short of a final declaration on the constitutionality of the village action, would be an idle gesture.
Therefore, this proceeding should be remitted to the trial level for the taking of additional proof to supplement the record and for the resolution of any disputed issues of fact that might arise with the proof. We are mindful of the delay and expense already incurred and we direct that the court below proceed expeditiously to conclude the necessary supplemental proceeding.
Although the present record is inadequate to resolve the constitutional issues presented, we can approve the part of the judgment which directs the village to comply with pertinent consent orders, as modified.[1] It has been established that the village is under legal constraint, imposed by the State, to improve its inadequate sewer system. Quite apart from whether delay to date in improvement has been damaging to property owners and unjustified, the village must undertake compliance with lawful and persistent State directives. By ordering that the village proceed in accordance with existing State consent orders and directives, the courts below have simply imposed judicial authority which may rest, all together comfortably, beside the executive authority previously asserted. In short, this aspect of the judgment requires the village to do only what other lawful authority has already directed it to do. In practical effect, the judgment blends executive direction into judicial injunction. Since the judgment is predicated upon State executive action, to which municipal self-rule, in any event, must yield, the judgment, in this respect, does not entail issues of a constitutional magnitude. The judgment has not added any additional sewer improvement requirements; rather it only makes available a *329 separate arsenal of sanctions in the event that the village fails to satisfy the requirements which the State has, or might, impose.
Assuming that the landowner has been prejudiced by an unreasonable delay on the part of the municipality, the question of proper constitutional remedy is reached. Of course, in the event that unreasonable delay is established, the landowner is entitled to a declaration that the ordinance, insofar as it requires the use of public sewers, may not be constitutionally applied to him. (See, e.g., Westwood Forest Estates v Village of South Nyack, 23 NY2d 424, supra; Matter of Overhill Bldg. Co. v Delany, 28 NY2d 449, 458, supra.) Thus, this petitioner would be constitutionally free from the requirement that his property be tied into the public sewer system. The property could be developed by the use of private sewer disposal systems, provided compliance is made with pertinent provisions of local law. (See Local Laws, 1968, No. 1 of Village of Camillus, art III.) He should have that option.
A permit for the construction of a private sewage disposal system may be obtained by the owner. Of course, the proposed facility must comply with all relevant State health and sanitary requirements and is subject to village inspection. (Local Law, 1968, No. 1 of Village of Camillus, art III, §§ 1, 2, 3.) In addition, the property owner would be required to operate and maintain the facility in a sanitary manner at all times. (§ 6.)
The remaining question is whether petitioner would be entitled to a money judgment for alleged temporary or permanent damages sustained. We have recently reiterated the rule that absent factors of governmental displacement of private ownership, occupation or management, the proper remedy for an invalid police regulation is a declaration of unconstitutionality and not compensation as for a taking in eminent domain. (French Investing Co. v City of New York, 39 NY2d 587, 594595, supra.) The only exception to this limitation to a nonpecuniary sanction is where the government intends that the property will eventually come into public ownership or where government has already intruded upon the property and inflicted virtually irreversible damage. (39 NY2d, at pp 594-595, quoting Costonis, "Fair” Compensation and the Accommodation Power: Antidotes for the Taking Impasse in Land Use Controversies, 75 Col L Rev 1021, 1035.) The present case does not involve either exception. (Compare Keystone Assoc. v State of New York, 33 NY2d 848, affg on opn at App Div 39 *330 AD2d 176; Matter of Keystone Assoc. v Moerdler, 19 NY2d 78.) Hence, there is no question but that damages for a permanent loss are not available. Indeed, whether the village repairs its sewers or petitioner builds his own sewage disposal system, development is not permanently frustrated.
The question still remains as to whether temporary or consequential damages resulting from unreasonable delay by the village in repairing its sewers are available. In fact, consequential damages are at the heart of the case, since, absent such damages, the petitioner is restricted to building his own private disposal system or waiting for the village to complete the necessary repairs. We have never passed directly upon the issue of consequential damages for an invalid police power regulation (see French Investing Co. v City of New York, 39 NY2d 587, 599, supra) and research has failed to disclose any helpful precedent. The only analogous situation, the Keystone litigation (where temporary damages were authorized for interference with the pending destruction of the Old Metropolitan Opera House), involved a situation of actual governmental encroachment. Even in that situation, the award of temporary damages has been criticized. Judge Breitel, in dissent, pointed out that a tort remedy for the harmful effects of unconstitutional legislation would, in effect, provide the very defect that made the legislation void. (Keystone Assoc. v State of New York, 33 NY2d 848, 850, supra.) The dissent also noted that there is no precedent for such an award and that the scope of liability would be potentially unlimited. It was stated that one result of the availability of tort relief "could well be the failure of or the delay in resistance to unconstitutional legislation until the quantum of damages has increased to make resistance worthwhile.” (33 NY2d, at p 851.)
The discussion contained in the Keystone dissent is far broader than the result reached by the majority. The facts of the case were that the owner of the Opera House intended to demolish the building and to erect an office tower. The Legislature forbade demolition of the existing structure, giving a private corporation time to gather sufficient funds to rescue the historic Opera House from the wrecker’s ball. In the meantime, the owners, having emptied the building of its contents, could only use the building for the purpose desired by the Legislature or permit it to sit idle and empty with resulting economic loss. On the first appeal to our court, we *331 concluded that the statute was a "condemnation statute” and the Legislature had, in effect, appropriated private property. (Matter of Keystone Assoc. v Moerdler, 19 NY2d 78, 87, 90, supra.) Later, the Appellate Division concluded, and a majority of our court agreed, that the property owner was entitled to damages for the de facto appropriation. (Keystone Assoc. v State of New York, 39 AD2d 176, 178-179, affd 33 NY2d 848, supra.)
The Keystone decisions are now bedrock law. In fact, we have had recent occasion to refer to those cases when we struck down a similar effort by government to coerce a private property owner to continue a use of the private property that the owner would have otherwise terminated and that the government preferred to have continued. (French Investing Co. v City of New York, 39 NY2d 587, 595, supra.) We cited Keystone as apt illustration of the availability of money damages where either private property was intended to eventually pass into governmental hands or where government had already intruded upon the land with irreversible, trespassory consequences. On the other hand, we noted that those two situations are the only ones in which money damages are available (p 595).
The majority’s resolution of the Keystone case is not controlling here. In that case, there had been an actual and direct governmental encroachment; a de facto taking linked to an avowed taking statute. (Lutheran Church in Amer. v City of New York, 35 NY2d 121, 130.) Here, by contrast, government has not directly intruded upon the land. Although the village may have unconstitutionally regulated, in one sense, the use of the land, government did not effectuate or intend a de facto taking. The dissent in Keystone is helpful only because the considerations it expressed went beyond the narrow facts involved. However, Keystone itself remains an unquestionable and invaluable decision, now firmly rooted in the law of the State.
Nevertheless, we decline to extend Keystone to a situation where there has been no de facto appropriation of private property and thereby create money liability for consequential damages to land even though there has been no governmental trespass. Although the present case involves damages to undeveloped land, the tort principle might be extended to drug regulations, rent control regulations, and a myriad of other socially oriented legislative programs. The prospect is limit *332 less. While a Damoclean sword of liability for damages to undeveloped land might encourage municipalities to build sewers, and thus serve as a beneficial spur, the same rationale might be applied to encourage the building of highways and streets, railroad facilities, airports, sidewalks, and hundreds of other governmental improvements, in effect stripping municipal officers of their discretionary power over the desirability and timing of public construction. More important, the prospect of tort liability might impede equally desirable governmental regulation and legislation since municipal officers might fear subsequent judicial imposition of massive tort recoveries. Open-ended liability could inhibit the enactment of needed, but constitutionally borderline, legislation. The most salutory and effective means to curtail unconstitutional action is to stop the action before it can take effect. Indeed, the prospect of a tort action might incite potential plaintiffs to cumulate their damage and institute their constitutional claims only after significant passage of time and significant reliance upon the heretofore unchallenged validity of its action by the governmental unit involved. In the absence of legislative guidance and compelling precendent, we decline to extend tort liability for unconstitutional action to situations where government has not trespassed in some manner upon the burdened property.
The government of municipalities is committed not to the courts, or to juries, but to elected governmental officers. Although the courts may properly set aside unconstitutional or unlawful conduct by municipal officials, their judgment and discretion is otherwise unchallengeable in the courts. The ultimate remedy for disgruntled citizens is in the polling booth. In the absence of constitutional or statutory contentions, the courts have only a limited role in the review of municipal activity. Most emphatic, absent a taking of property, the courts may not impose liability damages, particularly where the imposition appears to be more punitive than compensatory. The courts should not use the threat of money sanctions to whip government into providing municipal improvements.
Turning to the procedural aspects of this case, we conclude that article 78 relief was proper insofar as necessary to compel the village to comply with State directives. (CPLR 7803, subd 1.) As to the claim of unconstitutionality, the proper procedure is an action for a declaratory judgment. (See, *333 e.g., Matter of Overhill Bldg. Co. v Delany, 28 NY2d 449, 458, supra; Berenson v Town of New Castle, 38 NY2d 102, 107, n 1, supra.) Thus, the claim of unconstitutionality should be severed and this portion of the proceeding converted into an action for declaratory judgment, with leave to replead if the parties are so advised. The claims for money damages should be dismissed.[2]
As to the claim against the State, it should be dismissed in its entirety. The fault, if there be any, rests entirely with the village. The State Department of Environmental Conservation is involved solely because of its supervisory function in the prevention of water pollution. (See ECL 17-0301, 17-0303.) There is no State responsibility for providing local sewers.
The order of the Appellate Division should be modified and, as modified, affirmed, without costs.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order modified, without costs, and the matter remitted to Supreme Court, Onondaga County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.

. The judgment also directs that the State, upon proof of due compliance by the village, issue any necessary permits so that petitioner might connect to the public sewer. As discussed, infra, the State is not a proper party to this proceeding and the judgment below may not impose requirements upon the State. The county, which is also affected by the order, has not appealed.

. In light of our disposition of the merits of the claim for money damages, it is unnecessary to determine whether the claim should have been made in the context of a plenary action. It is of interest, nevertheless, that CPLR 7806 authorizes the recovery of money damages in an article 78 proceeding provided the claim for money is "incidental” to the primary relief and is such that might be recoverable on the same set of facts in a separate action in Supreme Court against the same governmental officer or body.