*818 OPINION OF THE COURT
Joseph Harris, J.
Neither anything in section 96-a of the General Municipal Law, nor article 5-K thereof, which are the legal sources for municipal historical preservation ordinances, authorizes a municipal corporation to impose restoration costs upon the owner of property in a designated historic district. Thus spoke the Court of Appeals in FGL & L Prop. Corp. v City of Rye (66 NY2d 111 [1985]).
Petitioner is the owner of premises located at 207 Lark Street in the City of Albany, New York, in the Center Square/ Hudson Park Historic District, which is subject to the jurisdiction of the Historic Review Commission of the City of Albany, established by the Historic Resources Commission Ordinance of the City of Albany, enacted June 1, 1988.
Lark Street, in the vicinity in which the premises are located, is a commercial area. The premises consist of a two-story wood frame structure, approximately 20 feet by 52 feet by 20 feet in dimension, at the northwest corner of the intersection of State Street and Lark Street in the City of Albany. It is connected to 205 Lark Street, which houses a grocery store known as Lemme’s Market, also owned by the petitioner herein, and is unused except to store certain fixtures and equipment used in said grocery store.
If "historic” is equated with "age”, the building is historic. Built between 1834 and 1847, it was remodeled in 1872, with the addition of some Italian and Cornish design. It was remodeled again in the 1930’s, with removal of the Italian design, which was replaced by Federal revival material.
Time has not been kind to the building. Over the years it has seriously deteriorated and become structurally unsound. The wall between 207 and 205 Lark Street was long ago taken down and substantially altered. The wall along State Street is unstable and covered with vinyl siding. The floor structure pitches excessively and a good deal of the floor structure is missing. The roof structure is in a state of decay. The ravages of time were further compounded by a major fire in April 1989, and the interior is charred and infested with fungus and rot.
By notice and order dated April 26, 1989, the Albany Building Commissioner, finding "that the [fire] damage had affected the structural stability of the south wall and had left the building in an open and hazardous condition”, ordered the *819 petitioner to barricade the premises, stabilize same on or before May 10, 1989, and secure a building permit for restoration of the premises on or before May 30, 1989.
Petitioner filed with the Historic Resources Commission an application for a "certificate of appropriateness” for the demolition of the premises and for permission to rebuild same. A public hearing was held on June 14, 1989, and continued upon diverse dates thereafter, at which the petitioner submitted two separate architect reports setting forth alternative plans, one for restoration and one for demolition and reconstruction, as well as an accountant’s feasibility study which demonstrated significant anticipated operating losses.[1]
Petitioner cooperated with the Commission to his level best. He produced his architect, his contractor, and his accountant, each of whom were questioned by the members of the Commission at length. But nothing seemed to satisfy the Commission.[2]
Ultimately reconciled to the fact that currently conceivable new construction and/or stabilization/restoration alternatives were not reasonably economically feasible, and would result in significant operating losses and undue economic hardship, as set forth in the financial projections of his accountants, and faced with the fact and the determination of the Building Commissioner that the premises were a public safety hazard that would have to be alleviated, the petitioner amended his application to seek a demolition permit only upon the grounds above set forth.
Petitioner presented his case to the Historic Resources Commission on August 23, 1989, arguing that he had assessed all reasonable alternatives for the use of the premises — as set *820 forth in this architect’s report — only to discover that same were not economically feasible and would result in severe economic hardship. Thereupon the Commission, at the same hearing, passed a resolution denying the application for a "certificate of appropriateness” required for a demolition permit on the grounds it did not have jurisdiction or authority to issue such a certificate unless the petitioner submitted and obtained design approval for new development in accordance with section 1-135 (b) (2) of the Historic Resources Commission Ordinance, and on the further grounds that it could not determine if the petitioner suffered economic hardship unless he filed detailed building plans for new construction pursuant to said section. An appeal to the Board of Zoning Appeals resulted, on October 26, 1989, in an affirmance of the decision of the Commission. The instant CPLR article 78 proceeding thereupon ensued.
THE LAW
Resolution of the issues of this case requires an understanding of the interplay between several basic sections of the Albany Historic Resources Commission Ordinance.
Section 1-131 is entitled "Certificate of appropriateness for alteration, demolition, or new construction, affecting landmarks or historic districts.” Subdivision (a) thereof, entitled "Certificate of appropriateness and building permit required”, states in pertinent part: "No person shall carry out any exterior alteration, restoration, reconstruction, demolition, new construction, or moving of a landmark or a property within an historic district, nor shall any person make any material change in the appearance of such a property * * * or other exterior elements visible from a public street or alley, without first obtaining a certificate of appropriateness and a building permit. ” (Emphasis added.) Subdivision (b) is entitled "Building permit requirements” and is self-explanatory. Subdivision (c) is entitled "Certificate of appropriateness: procedures and requirements”, and deals with applications for building permits for "proposed work that will affect the exterior of a landmark or a property within an historic district.” It deals exclusively with alterations, repairs and/or new construction. No mention whatever is made of "demolition.” If only "minor alterations” are involved, the application will be reviewed by the City Planning office; proposals for "major alterations or repairs * * * and/or new construction” will be reviewed by the Historic Resources Commission.
*821 Section 1-132 is entitled "Criteria for approval of a certificate of appropriateness”, and again deals with and sets up guidelines solely for redevelopment or new construction.
Section 1-135 is entitled "Waivers or Modifications, Demolitions.” Subdivision (a), entitled "Hardship”, states in pertinent part: "After receiving written notification from the Commission of the denial of a certificate of appropriateness, an applicant may request, in writing, a waiver or modification of any of the criteria or standards adopted pursuant to Section 1-132.” (As stated above, section 1-132 does not deal with applications for demolition per se, but solely with applications for redevelopment or new construction.)
Subdivision (b) of section 1-135 is entitled "Demolition Requirements”, and once again, in pertinent part, recites: “When passing upon an application for demolition, the Commission shall require a showing by the applicant that preservation of the building constitutes a hardship * * * or that the building is a non-contributing structure in the district. The Commission may require the applicant to provide an independent structural evaluation by a qualified structural engineer.” (Emphasis added.) Paragraph (2) of subdivision (b) contains the language relied upon by the Commission to deny the application for a demolition permit, stating: "Demolition shall be permitted only after the developer of the site has submitted and obtained design approval of his/her plans for new development.” (Emphasis added.) Section 1-135 (b) (2) goes on further to say: "In no case shall the time between demolition and commencement of new construction or lot improvement exceed six months. ” (Emphasis added.)
And finally, section 1-136.1, entitled "Powers limited”, declares: "This ordinance shall in no way affect, supersede, or abridge any emergency powers or other powers of the Commissioner of Buildings as to public safety, health, and welfare.”
Two considerations gravitate in favor of the relief requested by the petitioner and against the position expounded by respondents.
Firstly, it is clear that section 1-135 (b) (2), upon which respondents place their reliance for denying jurisdiction to approve a demolition permit without the submission of new development plans, is a construction or new development statute, not a demolition statute per se. Its reference to demolition has meaning and applicability only in the context *822 of an application for redevelopment or reconstruction of structurally sound and physically viable buildings, where demolition is merely an adjunct thereto and not an end in itself.
Expressed differently, it has applicability only to the voluntary demolition of a structurally sound and physically viable building, not, as in this case, the involuntary demolition of a structurally unsound, substantially damaged, and severely physically deteriorated building that has been declared to be a public safety hazard by the Building Commissioner, who has ordered the petitioner to abate such condition. To hold otherwise would be to compel restoration of the property, which would run afoul of the holding of the Court of Appeals in FGL & L Prop. Corp. v City of Rye (supra), and constitute an unconstitutional taking.[3]
The second of the two considerations referred to above is the holding of the Appellate Division, Fourth Department, in Wolk v Reisem (67 AD2d 819), in which the court, upon facts substantially similar to the facts in the instant case, rejected the exact same reasoning by the Rochester Preservation Board as followed by the Albany Historic Resources Commission herein, ruling that the only reasonable interpretation of a provision of the Rochester Historical Preservation Ordinance substantially the same as section 1-135 (b) (2) of the Albany ordinance herein, was that demolition and new construction are separate events, each requiring a separate and independent certificate of appropriateness, with a new construction application not being a precondition for consideration and approval of a demolition application. Apropos of a similar argument expressed by respondents in the instant case, and clearly one of the crucial concerns underlying the decision of the respondents herein, the Appellate Division in Wolk (supra, at 820) stated: "The Board’s decision also included its finding that demolition of the building 'would damage the integrity of the streetscape and further reduce the inventory of original structures which gives East Avenue its unique character in the City of Rochester.’ While the Board’s purposes and goals are indisputably laudable and generally deserving of unfettered support, we find its determination in the circumstances of this case to be arbitrary, capricious and an abuse of discre *823 tian. In the face of a clear threat to the public health and safety, the governmental duty to its citizens and civil servants to protect such vital interests must take precedence over the aesthetic and historical concerns expressed by a majority of the Preservation Board in denying petitioner’s application”. The reasonableness of this holding in Wolk is recognized in section 1-136.1 of the Albany Historic Resources Commission Ordinance, which, again, states: "This ordinance shall in no way affect, supersede or abridge any emergency powers or any other powers of the Commissioner of Buildings as to public safety, health, and welfare.”
It should be noted further that, once again, regardless of how laudable the concerns of the Historic Resources Commission to avoid blight and the aesthetic repugnancy of vacant lots in historic districts, which tend to become strewn with litter and debris and other unsavory matter, this is not a special concern generic to historic districts and historic preservation, but a concern of over-all urban planning in general. A weed-infested, debris-strewn vacant lot in an historic district is no more nor less unpalatable and intolerable than that same lot in another part of the city.
But, other than imposing the obligation of maintenance upon a landowner, government does not have the right to impose upon him the sole burden of an economically unfeasible restoration for the" general benefit of society-at-large. This would be an unconstitutional taking. (See, Lutheran Church in Am. v City of New York, 35 NY2d 121.) Landmark and historic preservation laws, "if they place an undue and uncompensated burden on the individual owner may be held [to be] unconstitutional (Lutheran Church in Am. v City of New York, 35 NY2d 121, 129) because 'it forces the owner to assume the cost of providing a benefit to the public without recoupment’ (French Investing Co. v City of New York, 39 NY2d 587, 596 * * *).” (FGL & L Prop. Corp. v City of Rye, supra, at 120.)
Where government attempts to, in effect, add property to public use by purely and simply invading the owner’s right to own and manage and economically enjoy his property, it is in effect invoking the power of eminent domain and must pay compensation to the owner. (Lutheran Church in Am. v City of New York, supra.) It is only fitting and proper that where the sole benefit to be derived from the use of property is to society in general, the burden of the operation of such property (absent a willing owner) be borne by society in general. In the *824 instant case, if the historic value of petitioner’s property outweighs the economic cost of historic restoration, and society desires to preserve that historic value, then society, embodied in its government, must condemn the property and bear the burden of the historic preservation. (Lutheran Church in Am. v City of New York, supra.)
For all of the above reasons the decision of the Historic Resources Commission, and the decision of the Board of Zoning Appeals affirming said decision, are arbitrary, capricious, and an abuse of discretion, and are hereby set aside. It is clear from the undisputed evidence before the Commission that the petitioner’s property is structurally unsound and physically nonviable and constitutes a clear threat to public safety, health, and welfare. This matter is remanded to the Historic Resources Commission of the City of Albany with the mandate that a certificate of appropriateness for demolition be granted,[4]
[5]upon any reasonable conditions requiring preservation and retention of any artifacts, moldings, and other building materials of significant historic value that can be used in connection with any future new construction at the site.®

. The cost of demolition and reconstruction would be $326,700; the cost of stabilization and restoration would be $374,900. Using a rent figure of $15 a square foot, which is highly unrealistic for the area in which the subject premises are located, the petitioner would barely break even under the new construction scenario, and lose approximately $48,000 a year if required to stabilize and restore the structure. With a rent figure of $12 a square foot he would lose an additional $7,500 a year, and with a rent figure of $10 per square foot he would lose a further $5,000 a year.

. Though well-meaning, no viable suggestions for redevelopment emanated from the Commission. They were more illusory than real. For example, a member suggested the possibility of replacing the two-story structure with a four-story one. However, four-story structures are alien to that section of Lark Street where the subject premises are located, and how a four-story structure could maintain the antiquity and historic integrity of the area is beyond comprehension.

. That is not to say that a legislature is without power to enact a statute that, with proper safeguards to prevent an unconstitutional economic taking, would impose restorative conditions on property with an historic designation. It is only to say that the Legislature has not yet seen fit to do so.

. Unless the appropriate authority elects to condemn the property by eminent domain.

. Future new construction, of course, will require a certificate of appropriateness from the Commission and be subject to any valid historic considerations, within the law, that may be required by the Commission.