*327
 
 Chief Judge Breitel.
 

 In broad terms, the problem in this case is determining the scope of governmental power, within the Constitution, to preserve, without resorting to eminent domain, irreplaceable landmarks deemed to be of inestimable social or cultural significance. In controversy is the constitutionality of regulation which would prohibit appellants, owner and proposed developer of the air rights above Grand Central Terminal, from constructing an office building atop the terminal.
 

 Undisputed is the principle, rooted in the due process clause of the Constitution, that government may not, by regulation, deprive a property owner of all reasonable return on his property. There are two issues nevertheless. The first is the extent to which government, when regulating private property, must assure what is described as a reasonable return on that ingredient of property value created not so much by the efforts of the property owner, but instead by the accumulated indirect social and direct governmental investment in the physical property, its functions, and its surroundings. The second issue is whether above-the-surface development rights, transferable to adjacent sites under the city landmark ordinance, may be considered in computing return on the property when the landmark property and some of the sites to which the rights may be transferred share a common owner.
 

 Plaintiffs, Penn Central Transportation Company and its affiliates, who have a fee interest in Grand Central Terminal, and UGP Properties, Inc., lessee of the development rights over the terminal, seek a declaration that the landmark preservation provisions of the Administrative Code of the City of New York, as applied to the terminal property, are unconstitutional. They also seek to enjoin defendants, the City of New York and the City Landmarks Preservation Commission, from enforcing those provisions against the subject property.
 
 *328
 
 Trial Term granted the requested relief, but a divided Appellate Division reversed and granted judgment to defendants. Plaintiffs appeal.
 

 The order of the Appellate Division should be affirmed. Although government regulation is invalid if it denies a property owner all reasonable return, there is no constitutional imperative that the return embrace all attributes, incidental influences, or contributing external factors derived from the social complex in which the property rests. So many of these attributes are not the result of private effort or investment but of opportunities for the utilization or exploitation which an organized society offers to any private enterprise, especially to a public utility, favored by government and the public. These, too, constitute a background of massive social and governmental investment in the organized community without which the private enterprise could neither exist nor prosper. It is enough, for the limited purposes of a landmarking statute, albeit it is also essential, that the privately created ingredient of property receive a reasonable return. It is that privately created and privately managed ingredient which is the property on which the reasonable return is to be based. All else is society’s contribution by the sweat of its brow and the expenditure of its funds. To that extent society is also entitled to its due.
 

 Moreover, in this case, the challenged regulation provides Penn Central with transferable above-the-surface development rights which, because they may be attached to specific parcels of property, some already owned by Penn Central or its affiliates, may be considered as part of the owner’s return on the terminal property.
 

 Thus, the regulation does not deprive plaintiffs of property without due process of law, and should be upheld as a valid exercise of the police power.
 

 Grand Central Terminal was formally opened to the public in 1913. Undisputed is its architectural, historical, and cultural significance (for further detail see opn at App Div, 50 AD2d 265, 269). On August 2, 1967, in accordance with the provisions of the New York City Administrative Code, the terminal was designated a landmark by the Landmarks Preservation Commission, and the designation was confirmed by the Board of Estimate on September 21, 1967 (see Administrative Code of City of New York, § 207-2.0).
 

 On July 18, 1968, plaintiffs submitted to the Landmarks
 
 *329
 
 Preservation Commission an application for a permit to construct the proposed office building, seeking a certificate that the work would have no exterior effect on protected architectural features (Administrative Code, § 207-5.0). The request was denied on September 20, 1968. Then plaintiffs applied to the commission for a certificate that the proposed building, even if it would have had an exterior effect, was appropriate to the site (Administrative Code, § 207-6.0). Three separate alternative proposals, each calling for erection of a substantial office building atop the terminal, were submitted. On August 26, 1969, the certificate of appropriateness was denied. Not involved, because not raised in light of the denial of a certificate of appropriateness, are the plans for the interior of the terminal. None of these administrative determinations was ever directly challenged in the courts (cf.
 
 Lutheran Church in Amer. v City of New York,
 
 35 NY2d 121, 126-128).
 

 Instead, on October 7, 1969, plaintiffs brought this action seeking judicial invalidation of the landmark preservation provisions of the Administrative Code as applied to the terminal. Plaintiffs also sought damages for a temporary "taking” of property from the time of original designation as a landmark to the time of the requested judicial invalidation. Of course, any so-called temporary "taking” is more accurately described as a deprivation of property without due process of law
 
 (French Investing Co. v City of New York,
 
 39 NY2d 587, 593-595, app dsmd 429 US 990).
 

 Trial court found the landmark preservation provisions, as applied, constitutionally deficient, but severed the question of damages. As noted, the Appellate Division, with two dissenters, reversed, and granted judgment to defendants.
 

 This is not a zoning case. In many ways, the restrictions imposed on the use of the property are similar to zoning restrictions, but the purposes are different, and in determining whether regulation is reasonable, the purposes behind the regulation assume considerable significance
 
 (id.,
 
 p 596). Zoning restrictions operate to advance a comprehensive community plan for the common good. Each property owner in the zone is both benefited and restricted from exploitation, presumably without discrimination, except for permitted continuing nonconforming uses. The restrictions may be designed to maintain the general character of the area, or to assure orderly development, objectives inuring to the benefit of all, which property owners acting individually would find difficult or impossible to
 
 *330
 
 achieve (see, e.g.,
 
 Berenson v Town of New Castle,
 
 38 NY2d 102, 109-110;
 
 Matter of 113 Hillside Ave. Corp. v Zaino,
 
 27 NY2d 258, 262-263).
 

 Nor does this case involve landmark regulation of a historic district. Historic district regulation, like zoning regulation, may be designed to maintain the character, both economic and esthetic or cultural, of an area (see
 
 Maher v City of New Orleans,
 
 516 F2d 1051, esp p 1060, cert den 426 US 905;
 
 Opinion of the Justices to the Senate,
 
 333 Mass 773, 778-780). The difference, generally, is that zoning does this largely by regulating construction of new buildings, while historic district regulation concentrates instead on preventing alteration or demolition of existing structures. In each case, owners although burdened by the restrictions also benefit, to some extent, from the furtherance of a general community plan.
 

 Nor does this case partake of the principles applicable to a taking in eminent domain. As noted earlier, there is no taking for which just compensation must be paid. And it is the concept of just compensation which is so integrally related to value based on return. Instead, landmark regulation is a limitation on exploitation of property, an attribute shared with the classifications of zoning and historic districting. Yet landmark regulation is different because the burden of limitation is borne by a single owner. He may or may not benefit from that limitation but his neighbors most likely will. In contrast both an owner and his neighbors benefit to some degree and in some manner from zoning and historic districting.
 

 Restrictions on alteration of individual landmarks are not designed to further a general community plan. Landmark restrictions are designed to prevent alteration or demolition of a single piece of property. To this extent, such restrictions resemble "discriminatory” zoning restrictions, properly condemned, affecting properties singled out in a zoning district for more restrictive or more liberal zoning limitations (see
 
 Udell v Haas,
 
 21 NY2d 463, 476-478). There is, however, a significant difference. Discriminatory zoning is condemned because there is no acceptable reason for singling out one particular parcel for different and less favorable treatment. When landmark regulation is involved, there is such a reason: the cultural, architectural, historical, or social significance attached to the affected parcel. Even when regulation is designed to achieve such an acceptable purpose, however, the
 
 *331
 
 landowner must be allowed a reasonable return or equivalent private use of his property (cf.
 
 French Investing Co. v City of New York,
 
 39 NY2d 587, 596,
 
 supra).
 
 That is, in the case of commercial property, the owner must be assured of a continued reasonable return on the property.
 

 Reasonable return, however, is an elusive concept, incapable of easy definition. For the reasonableness of the return must be based on the value of the property, and the value of the property necessarily depends on the return permitted or available. The inevitable circularity of reasoning is obvious (see Berger, The Accommodation Power in Land Use Controversies: A Reply to Professor Costonis, 76 Col L Rev 799, 818-819). In most landmark cases, however, it is acceptable to use alternative bases of valuation, assessed valuation perhaps, as a basis for determining the reasonableness of return (see Administrative Code, § 207-1.0, subd [v]). At best, the computation is rough and successful if it is fairly approximate. In considering reasonable return the owner’s desire to expand the property physically or functionally affects the base upon which the return is to be computed. Again, there may be a circularity of cause and effect.
 

 Grand Central Terminal is no ordinary landmark. It may be true that no property has economic value in the absence of the society around it, but how much more true it is of a railroad terminal, set amid a metropolitan population, and entirely dependent on a heavy traffic of travelers to make it an economically feasible operation. Without people Grand Central would never have been a successful railroad terminal, and without the terminal, a major transportation center, the proposed building site would be much less desirable for an office building.
 

 Of course it may be argued that had Grand Central Terminal never been built, the area would not have developed as it has. Thus, the argument runs, construction of the terminal triggered growth of the area, and created much of the terminal property’s current value. Indeed, the argument has some validity. But, in reality, it is of little moment which comes first, the terminal or the travelers. For it is the interaction of economic influences in the greatest megalopolis of the western hemisphere—the terminal initially drawing people to the area, and the society developing the area with shops, hotels, office buildings, and unmatched civil services—that has made the property so valuable. Neither factor alone accounts for the
 
 *332
 
 increase in the property’s value; both, in tandem, have contributed to the increase.
 

 Of primary significance, however, is that society as an organized entity, especially through its government, rather than as a mere conglomerate of individuals, has created much of the value of the terminal property. Although recent financial troubles and consequent governmental assistance make the fact more apparent, railroads have always been a franchised and regulated public utility, favored monopolies at public expense, subsidy, and with limited powers of eminent domain, without which their existence and character would not have been possible (cf.
 
 Ball v New York Cent. R. R. Co.,
 
 229 NY 33, 43;
 
 Schaghticoke Powder Co. v Greenwich & Johnsonville Ry. Co.,
 
 183 NY 306, 316). Even in the best of times, railroads were dependent on government-granted monopolies for their rights of way, government grants for their land, and government assistance for such projects as grade crossing eliminations. Railroads were given franchises to use city streets without charge, often to the detriment of neighboring residents and often without leaving the city power to terminate the franchise (cf.
 
 Kellinger v Forty-Second St. & Grand St. R. R. Co.,
 
 50 NY 206, 210, 212;
 
 New York Cent. & Hudson Riv. R. R. Co. v City of New York,
 
 202 NY 212, 221-224). Through the years, Penn Central and its predecessors have benefited mightily from this assistance. Today, government influence is even more pervasive, extending even to the real estate tax exemption enjoyed by Grand Central Terminal itself (Real Property Tax Law, § 489-ff).
 

 Government has aided the terminal in dess direct ways, as well. It is no accident that much of the city’s mass transportation system converges on Grand Central. Numerous subways and bus routes pass through or near the terminal. Without the assistance of the city’s transit system, now municipally owned and subsidized, the property, with or without a towering office structure atop it, would be of considerably decreased value. It is true that most city property benefits to some extent from public transportation, but the benefit is peculiarly concentrated and great in the area surrounding Grand Central Terminal.
 

 Absent this heavy public governmental investment in the terminal, the railroads, and connecting transportation, it is indisputable that the terminal property would be worth but a fraction of its current economic value. Plaintiffs may not now
 
 *333
 
 frustrate legitimate and important social objectives by complaining, in essence, that government regulation deprives them of a return on so much of the investment made not by , private interests but by the people of the city and State through their government. Instead, to prevail, plaintiffs must establish that there was no possibility of earning a reasonable return on the privately contributed ingredient of the property^ value.
 

 To put the matter another way, the massive and indistinguishable public, governmental, and private contributions to a landmark like the Grand Central Terminal are inseparably joint, and for most of its existence, made both the terminal and the railroads of which it was an integral part, a great financial success for generations of stockholders and bondholders. Their investment has long been eliminated or impaired by the recent vicissitudes of the Penn Central complex. It is exceedingly difficult but imperative, nevertheless, to sort out the merged ingredients and to assess the rights and responsibilities of owner and society. A fair return is to be accorded the owner, but society is to receive its due for its share in the making of a once great railroad. The historical, cultural, and architectural resource that remains was neither created solely by the private owner nor solely by the society in which it was permitted to evolve.
 

 Plaintiffs contend that the terminal currently operates at a loss. Even if that be true, it is not of critical importance. What is significant, instead, is whether the property, managed efficiently, is capable of producing a reasonable return. If the courts were forced to look to the property as it is, rather than as it could be, any inadequacy of managers of property could frustrate any land use restrictions.
 

 Perhaps of greater importance, the property may be capable of producing a reasonable return for its owners even if it can never operate at a profit. For it should be evident that plaintiffs’ heavy real estate holdings in the Grand Central area, including hotels and office buildings, would lose considerable value and deprive plaintiffs of much income, were the terminal not in operation. Some of this income must, realistically, be imputed to the terminal.
 

 The situation is analogous to that of a flagship store in a regional shopping center. The flagship store may not produce enough income to justify its construction or maintenance, but it may draw enough customers into the other, smaller stores,
 
 *334
 
 to make its operation worthwhile, and to extract concessions from the owners of the remainder of the center (see
 
 G.R.F., Inc. v Board of Assessors of County of Nassau,
 
 41 NY2d 512, 514). So it is with Grand Central Terminal. The terminal acts, in effect, as a magnet for Penn Central’s other, more profitable, enterprises.
 

 The discussion thus far is in accord with the teachings of
 
 Lutheran Church in Amer. v City of New York
 
 (35 NY2d 121,
 
 supra).
 
 The Lutheran Church, owner of the landmark site, established, as plaintiffs here have not, that economic considerations did not permit maintenance of the landmark building in its existing form
 
 (id.,
 
 p 132). Moreover, the Lutheran Church was a charitable institution which, over the years, did not and could not reap the same pecuniary benefits of massive governmental investment enjoyed by the railroads and Grand Central Terminal. Yet, the regulatory provisions prohibited replacement of the landmark building without any new ameliorative provisions, other than the pre-existing tax exemption to which it had always been entitled, to assure that the property remained capable of usefulness on a reasonable economic basis. The same problem was reached and discussed in
 
 Matter of Trustees of Sailors’ Snug Harbor v Platt
 
 (29 AD2d 376, esp p 378). In recognizing the invalidity of the landmark regulation as applied to Lutheran Church, however, this court, as had the court in the
 
 Sailors’ Snug Harbor
 
 case
 
 (supra),
 
 declined to strike down the landmarks preservation provisions of the city administrative code
 
 (id.,
 
 pp 131-132). In this case, by contrast, there has been no showing that the property, owned not by a charitable enterprise but by an entity existing to make a profit, is incapable in its economic context of producing a reasonable return, even if its development is limited.
 

 Moreover, plaintiffs have not been wholly deprived of the development rights above the terminal. Those rights have been made transferable to other parcels of land in the vicinity, at least eight of them owned by Penn Central, including the sites of the Biltmore, Commodore, Barclay, and Roosevelt Hotels.
 

 The many defects in New York City’s program for development rights transfers have been detailed elsewhere (Costonis, The Chicago Plan: Incentive Zoning and the Preservation of Urban Landmarks, 85 Harv L Rev 574, 585-589). The area to which transfer is permitted is severely limited, complex proce
 
 *335
 
 dures are required to obtain a transfer permit, and the program, it has been said, has the unfortunate consequence of encouraging large, bulky buildings around landmarks which are dwarfed by comparison. But the possibility that a better program could have been devised does not preclude analysis and justification of the existing one in this particular application.
 

 That several of the potential receiving parcels are encumbered by long-term leases or currently improved with suitable buildings does not make the development rights worthless. The knowledge that at some future time, when the lease term has run out or the improvements have lost their utility, a larger building could be constructed, should increase the value of the building plot, at least so long as there is a market demand for new construction (see Costonis, "Fair” Compensation and the Accommodation Power: Antidotes for the Taking Impasse in Land Use Controversies, 75 Col L Rev 1021, 1067).
 

 Moreover, in this case, construction of new office buildings was at least given serious consideration on two of the available receiving parcels, the sites of the Biltmore and Roosevelt Hotels. Defendants contend that the alternative sites, and particularly the Biltmore site, are better suited for office building construction than even the terminal site. But that is beside the point. Important instead is the availability of receiving parcels, in common ownership with the landmark site, on which the development rights, or some of them, could be used. It is significant, as well, that the challenged regulation permitted splitting of the development rights among several receiving parcels, to allow optimal use of the rights.
 

 Development rights, once transferred, may not be equivalent in value to development rights on the original site. But that, alone, does not mean that the substitution of rights amounts to a deprivation of property without due process of law. Land use regulation often diminishes the value of the property to the landowner. Constitutional standards, however, are offended only when that diminution leaves the owner with no reasonable use of the property. The situation with transferable development rights is analogous. If the substitute rights received provide reasonable compensation for a landowner forced to relinquish development rights on a landmark site, there has been no deprivation of due process. The compensation need not be the "just” compensation required in eminent domain, for there has been no attempt to take property (see
 
 *336
 

 French Investing Co. v City of New York,
 
 39 NY2d 587, 595,
 
 supra;
 
 cf. Costonis, "Fair” Compensation and the Accommodation Power, 75 Col L Rev 1021, 1061-1070).
 

 The case at bar, like the
 
 French
 
 case
 
 (supra),
 
 fits neatly into this analysis. In
 
 French
 
 the development rights on the original site were quite valuable. The regulations deprived the original site of any possibility of producing a reasonable return, since only park uses were permitted on the land. And, the transferable development rights were left in legal limbo, not readily attachable to any other property, due to a lack of common ownership of the rights and a suitable site for using them. Hence, plaintiffs were deprived of property without due process of law. The regulation of Grand Central Terminal, by contrast, permitted productive use of the terminal site as it had been used for more than half a century, as a railroad terminal. In addition, the development rights were made transferable to numerous sites in the vicinity of the terminal, several owned by Penn Central, and at least one or two suitable for construction of office buildings. Since this regulation and substitution was reasonable, no due process violation resulted.
 

 To recapitulate, a property owner is not absolutely entitled to receive a return on so much of the property’s value as was created by social investment. And, even as to the privately created ingredient of the property’s value, a plaintiff seeking to show that an otherwise reasonable land use regulation constitutes a deprivation of due process of law must demonstrate affirmatively that the regulation eliminates all reasonable return (see
 
 Mary Chess, Inc. v City of Glen Cove,
 
 18 NY2d 205, 209-210;
 
 Shepard v Village of Skaneateles,
 
 300 NY 115, 118). Plaintiffs in this case have failed to meet that burden. In none of their analyses do they include the benefits provided to Penn Central’s varied real estate holdings by the terminal’s operation. These real, albeit indirect, benefits alone might suffice to provide Penn Central with a reasonable return. But there is more. The development rights above Grand Central Terminal have been made transferable, and could be transferred to several sites owned by Penn Central and suitable for office building construction. These substitute rights are valuable, and provide significant, perhaps "fair”, compensation for the loss of rights above the terminal itself. Hence, no constitutional violation has been established.
 

 
 *337
 
 In times of easy affluence, preservation of historic landmarks through use of the eminent domain power might be desirable, or even required. But when a less expensive alternative is available, especially when a city is in financial distress, it should not be forced to choose between witnessing the demolition of its glorious past and mortgaging its hopes for the future. The landmark preservation provisions of the Administrative Code represent an effort to take a middle way (Marcus, Mandatory Development Rights Transfer and the Taking Clause: The Case of Manhattan’s Tudor City Parks, 24 Buff L Rev 77, 78, 107-110). The statute needs improvement. In some cases it protects property owners inadequately
 
 (Lutheran Church in Amer. v City of New York,
 
 35 NY2d 121,
 
 supra).
 
 But, in its generality and as applied to Grand Central Terminal, the statute does not deprive plaintiffs of due process of law.
 

 In concluding the analysis, it is recognized that one does not pursue a path guided by ample precedent or wholly developed principles. The area is not merely difficult; it has at present viewing impenetrable densities. Theo last word has not only not been spoken; it has hardly been envisaged. For this case, and for the cases which may follow in its wake, deference to the unknown must be accorded. Moreover, the analysis has not been one which had been fully developed in the valuable presentations by counsel either at nisi prius, the Appellate Division, or in this court. In fairness then, and in order to assure that the better application of the rule be evolved, if counsel be so advised, they should be entitled to present at nisi prius any additional submissions which, in the light of this opinion, may usefully develop further the factors discussed. On the present record, however, the result directed by the Appellate Division is correct and in accordance with the views expressed in this opinion.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
 

 Order affirmed.