In the Matter of HARRY O. SPEARS et al., Petitioners, v PETER A. A. BERLE, as Commissioner of Environmental Conservation, et al., Respondents.

Third Department, July 20, 1978

APPEARANCES OF COUNSEL

*David E. Goldman* for petitioners.

*Louis J. Lefkowitz, Attorney-General (Julius Feinstein, Stanley Fishman* and *Ruth Kessler Toch* of counsel), for respondents.

**OPINION OF THE COURT**

MAHONEY, P. J.

Petitioners own two family businesses in Port Jervis, New York, which manufacture and sell sand, stone, gravel, humus, cement, asphalt, cinder blocks, cement blocks, redi-mix concrete and allied masonry products. Petitioners purchased two properties which they leased to these businesses for the purpose of obtaining raw materials. One property, the "Culver" property, is a 50-acre parcel containing 38 acres of freshwater wetland known as "Cold Brook". The second piece is the "Cejwin" property consisting of 43 acres containing an eight-acre area known as "Spears' Bog". Under ECL 24-0301 (subd 1) effective September 1, 1975, the Commissioner of the State Department of Environmental Conservation is to identify freshwater wetlands having at least 12.4 acres or having been determined to be of unusual local importance. Upon such identification, an owner of wetlands is prohibited from making commercial use of any property within 100 feet of the wetlands without obtaining a permit from the Department of Environmental Conservation. In January, 1977, Spears' Bog was determined by the commissioner to be of unusual local importance. The Culver property was freshwater wetlands by virtue of its size. Accordingly, petitioners applied, on March 9,

1977, for an interim permit for the alteration of these fresh-water wetlands properties. A public hearing was held on June 29, 1977. It was undisputed that petitioners' plans for removal of humus, sand and stone from these two properties would to a great extent destroy the wetlands, significantly harming the wildlife and natural habitat.

The expressed policy engendering the act is to "preserve, protect and conserve freshwater wetlands and the benefits derived therefrom, to prevent the despoliation and destruction of freshwater wetlands, and to regulate use and development of such wetlands to secure the natural benefits of freshwater wetlands, consistent with the general welfare and beneficial economic, social and agricultural development of the state." (ECL 24-0103.)

A permit must be obtained from the Commissioner of Environmental Conservation in order to carry out virtually any activity on a freshwater wetland.[1] The only uses of right are "[t]he depositing or removal of the natural products of the freshwater wetlands by recreational or commercial fishing, shell-fishing, aquaculture, hunting or trapping" and "[t]he activities of farmers and other landowners in grazing and watering livestock, making reasonable use of water resources, harvesting natural products of the wetlands, selectively cutting timber, draining land or wetlands for growing agricultural products" (ECL 24-0701, subds 3, 4).

The wetland owner seeking a permit has "the burden of demonstrating that the proposed activity will be in accord with the policies and provisions of this article." (ECL 24-0703, subd 3.) In passing upon permit applications the commissioner "shall consider the effect of the proposed activity with reference to the public health and welfare, fishing, flood, hurricane and storm dangers, and protection or enhancement of the several functions of the freshwater wetlands and the benefits

---

1. A permit is required to undertake "any form of draining, dredging, excavation, removal of soil, mud, sand, shells, gravel or other aggregate from any freshwater wetland, either directly or indirectly; and any form of dumping, filling, or depositing of any soil, stones, sand, gravel, mud, rubbish or fill of any kind * * * erecting any structures, roads, the driving of pilings, or placing of any other obstructions whether or not changing the ebb and flow of the water; any form of pollution, including but not limited to, installing a septic tank, running a sewer outfall, discharging sewage treatment effluent or other liquid wastes into or so as to drain into a freshwater wetland; and any other activity which substantially impairs any of the several functions served by freshwater wetlands or the benefits derived therefrom which are set forth in section 24-0105 of this article." (ECL 24-0701, subd 2.)

derived therefrom * * * set forth in section 24-0103". (ECL 24-0705, subd 1.) Furthermore, no permit may issue "unless the proposed activity is consistent with the land use regulations applicable pursuant to section 24-0903 of this article". (ECL 24-0705, subd 3.)

Standards for issuing interim permits, not expressly set out in the statute, have been promulgated by the commissioner (6 NYCRR Part 662). As will be the case for final permits after the State map is prepared, an interim permit must be obtained in order to engage in virtually *any* activity on a freshwater wetland.[2]

In considering applications for interim permits, the commissioner must weigh "the effect of the proposed alteration with reference to the public health and welfare, wildlife resources, fishing, dangers from floods, hurricanes and storms and protection or enhancement of the several functions of the wetlands and the benefits derived therefrom which are set forth in section 24-0105 of the act." (6 NYCRR 662.8 [a].) Moreover, an interim permit may not be issued unless the applicant proves the project "is consistent with the policy of the act to preserve * * * freshwater wetlands * * * [and] with the general welfare and beneficial economic, social and agricultural development of the State", "is compatible with the public health and welfare", "is reasonable and necessary", and "has no reasonable alternative on a site which is not a freshwater wetland". (6 NYCRR 662.8 [c].)

Finally, the applicant must also show that he will suffer a "hardship" if the interim permit is denied (6 NYCRR 662.8 [b]). "Hardship" is "a condition unique and peculiar to the particular situation of the applicant, which tends to impose a serious financial, health or safety burden on the applicant or the public. Such condition shall not have been one created as a result of a voluntary act of the applicant * * * The fact that an increase or decrease in the value of the real property may result from the [Freshwater Wetlands Act] * * * will not, by itself, be considered evidence of hardship." (6 NYCRR 662.1 [m].)

At the hearing held on their application for a permit, petitioners conceded that their proposed mining use would be

---

2. Under the regulations (6 NYCRR 662.2), uses not requiring an interim permit are those agricultural-type uses specified in section 24-0701 (subds 3, 4) set out above (such as fishing, "aquaculture", and "selectively" cutting timber) and certain other uses of little value to a private owner (such as "public health activities").

inconsistent with the conservation policy stated in section 24-0103 and implicit throughout the act and the regulations. The bulk of the evidence concerned the hardship question.

It appears that once the applicants conceded that the mining would destroy the wetlands, litigation on the hardship question was futile since a permit may not be issued if the proposed use is inconsistent "with the policy of the act to preserve * * * freshwater wetlands * * * and * * * to prevent [their] destruction" (6 NYCRR 662.8 [c] [1]; ECL 24-0103). In any event, given the burden of proof placed on applicants by the statute and regulations, it is not surprising that the interim permit was denied.

However, there remains the question for this court whether the use restrictions imposed on petitioners' land by the Freshwater Wetlands Act and the regulations promulgated in furtherance thereof would, unless struck down, constitute a taking. Section 24-0705 provides for article 78 review of the commissioner's decision on the permit application, and subdivision 7 of that section states that "[i]n the event that the court finds the action reviewed constitutes a taking without just compensation * * * the court may, at the election of the commissioner, either (i) set aside the order or (ii) require the commissioner to proceed under the condemnation law to acquire the wetlands or such less than fee rights therein as have been taken."

Various rules of decision have been used to determine at what point government regulation under the police power amounts to an unconstitutional deprivation of property (see Sax, Takings and The Police Power, 74 Yale LJ 36, 38-50). In New York the traditional standard has been that suggested by Mr. Justice HOLMES in *Pennsylvania Coal Co. v Mahon* (260 US 393, 415), wherein it was said "that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."

The Court of Appeals, in two cases invalidating zoning restrictions, made the standard of the *Pennsylvania Coal* case more workable by specifying the extent of regulation which would be deemed "too far". "An ordinance which *permanently* so restricts the use of property that it cannot be used for any reasonable purpose goes * * * beyond regulation, and must be recognized as a taking of the property." (*Arverne Bay Constr. Co. v Thatcher,* 278 NY 222, 232; see *Vernon Park Realty v City of Mount Vernon,* 307 NY 493.)

This quantitative standard (i.e., based upon the extent to which the value of the property is diminished) of measuring the constitutionality of property regulation may be criticized on several grounds (see Sax, *supra,* pp 50-60), but its main practical weakness is that what is a "reasonable use" is itself a complex question, subject to variable interpretations. (See, e.g., *Penn Cent. Transp. Co. v City of New York,* 42 NY2d 324, affd 438 US 104.)

Perhaps for this reason the Court of Appeals, when faced with a new and alarming type of regulation (Landmark Preservation), indicated a new standard might be adopted. Under the new standard, a distinction is made between regulation which seeks to preserve private property for the common good from that which merely arbitrates between private parties the manner in which property is used (see *Lutheran Church in Amer. v City of New York,* 35 NY2d 121). The court, citing Professor Sax's article *(supra),* stated (p 129) that: "[w]here government acts in its enterprise capacity, as where it takes land to widen a road, there is a compensable taking. Where government acts in its arbitral capacity, as where it legislates zoning or provides the machinery to enjoin noxious use, there is simply noncompensable regulation." In invalidating a New York City Law which prohibited the Lutheran Church from altering its office building (designated a "landmark" by the City Landmark Commission) on Madison Avenue, the court found (p 132) that the city was "attempting to add this property to the public use", in effect, take it without compensation.

However, in *Penn Cent. Transp. Co. v City of New York (supra)* (upholding the constitutionality of the designation of Grand Central Terminal as a landmark), the court appears to have withdrawn from the novel approach and returned to the traditional standard, i.e., whether the restriction in question prohibits all reasonable use of the property. The extensive discussion by Chief Judge BREITEL in *French Investing Co. v City of New York* (39 NY2d 587) also indicates that the reasonable use test continues in force. In fact, Professor Sax, from whose writings the *Lutheran Church* court drew the new test, seems himself to have some doubts about the enterprise/arbitration distinction (Sax, Takings, Private Property and Public Rights, 81 Yale LJ 149). Nevertheless, the *Lutheran Church* case has not been repudiated, and a case decided after *French Investing Co.* suggests there may be continued vitality

to the distinction (see *Matter of Grimpel Assoc. v Cohalan,* 41 NY2d 431, 433).

Regardless of the status of the *Lutheran Church* standard, it is important to note that, as in the case of landmark preservation laws, wetland statutes such as the one restricting petitioners' land are an effort to preserve a particular piece of private property for the benefit of the community at large, not an attempt to direct the course of future development. It is not zoning in the ordinary sense; it is an effort to foreclose any development because the pristine condition is deemed aesthetically and, perhaps, ecologically valuable[3] to the commonwealth.

The analogy to landmark preservation is a strong one, except that the burden on the wetlands owner is likely to be greater than on one who owns a structure designated a landmark, since the structure may be of some economic value (see *Penn Cent. Transp. Co., supra).* Manifestly, a swamp which because of use regulations can neither be mined nor filled ordinarily would be worth little or nothing. Thus, laws prohibiting alteration of private wetlands have in the majority of cases been invalidated as unconstitutional deprivations of property *(Morris County Land Improvement Co. v Township of Parsippany-Troy Hills,* 40 NJ 539; *Bartlett v Zoning Comm.,* 161 Conn 24; *Dooley v Town Planning & Zoning Comm.,* 151 Conn 304; *State v Johnson,* 265 A2d 711 [Me]; *Hager v Louisville & Jefferson County Planning & Zoning Comm.,* 261 SW2d 619 [Ky]; but see *Candlestick Props. v San Francisco Bay Conserv. & Dev. Comm.,* 11 Cal App 559; *Sibson v State,* 115 NH 124; *Just v Marinette County,* 56 Wis 2d 7).

■ Even if the Freshwater Wetlands Act is generically a mere form of zoning and, therefore, the traditional test of constitutionality is to be applied, the restrictions imposed on petitioners' land are clearly invalid. A zoning restriction violates due process if it "renders the property unsuitable for any reasonable income productive or other private use for which it is adapted and thus destroys its economic value, or all but a bare residue of its value [citations omitted]" *(French Investing Co. v City of New York,* 39 NY2d 587, 596, *supra).*

Because of the administrative structure of the Freshwater

---

3. There is no proof that mining sand, gravel and humus would have any noxious effect on adjoining lands. Respondents' witnesses testified that the wetlands in question support certain types of plants and animals which, although not in danger of extinction, are of scientific and educational value.

Wetlands Act, it is difficult for an applicant to prove exactly what the restrictions on his lands are. The respondent commissioner essentially argues that only one permit application has been denied, so that at present only one use (mining sand, gravel and humus) has been foreclosed.

Petitioner Richard A. Spears[4] was the sole witness for petitioners at the hearing. When asked on direct whether there was "any type of use [aside from the mining use requested in the permit application] that can be made of any part of your properties that have been designated wetlands, whether it be mining, manufacturing, industrial, or residential use, that could result in a reasonable economic return", he answered, without objection from respondent, that there was not. On cross-examination he testified that even absent legal use restriction mining was the only economical use since the cost of filling the wetlands would be greater than the value of the resultant development site. On redirect, he was read the conservation policy statement set forth in section 24-0103 and the regulations (6 NYCRR 662.8 [c] [1]) (conformity to which policy is a necessary condition for a project to receive either a permanent or interim permit) and asked if it were possible to propose any economical project which would be consistent with the policy. Spears replied that it was not possible.

The petitioners thus offered evidence tending to prove that the restrictions of the statute extinguished all reasonable economic uses of the land. The respondents failed to submit *any* proof to the contrary. Respondents' witness Borko testified only that the wetlands had educational and scientific value. Such public uses have been recognized as of inconsequential value to a private owner *(Matter of Grimpel Assoc. v Cohalan, 41 NY2d 431, supra)*.

The exact purchase price paid by petitioners is not clear from the record (the 95-acre tract was assembled through two purchases, one in 1974, the other in 1976), but at the time of the hearing they still owed some $90,000[5] on purchase-money

4. Mr. Spears has a degree in business management, is familiar with the wetland tract in question, and has been working in the family cement block, gravel, and humus business adjoining the tract for 18 years.

5. Of this, some $30,000 was owed on the 52-acre "Culver Property". Fourteen of these acres were not wetlands, and have been set aside for residential development. No residential lots have been sold, although two houses have been built for petitioners or members of their families. No use has been made of the 43-acre "Cejwin Property", upon which some $60,000 is owed.

mortgages. The only uses of right are hunting, fishing, cutting timber, "aquaculture", and "draining land * * * for growing agricultural products". (ECL 24-0701, subds 3, 4.) The petitioners offered proof, the competency of which was not challenged at the hearing, that none of these uses was feasible. The respondents, although in control of personnel with expert knowledge of such esoteric subjects as "aquaculture", did not offer any evidence to show that the uses of right could produce a reasonable economic return.

As for the uses which may be allowed by permit, the respondents failed to answer Mr. Spears' testimony that no economic use would be consistent with the policy set out in section 24-0103. In his brief, the commissioner suggests that a less intrusive mining project might gain approval and points to the testimony of department employee Kolts: "In the Cold Brook wetland, parts of that wetland could possibly be removed under the right conditions and by the right methods so that reasonable sized potholes might be created, some distance apart along the course of Cold Brook. The development of these pothole areas through extraction activities, with areas between the potholes left undisturbed, might increase waterfowl habitat and provide a warm water fishing habitat in Cold Brook." This prospective right, dependent on administrative discretion, is hardly one upon which to build a citadel. Aside from being tenuous, it may be of no value even if realized. There is no averment by Kolts or any other witness that such a mining program could be carried out at a profit. Moreover, the regional permit administrator testified that an application for such a less intrusive mining operation "would be a very serious request * * * and without a preponderance of evidence showing that such a limited activity would not cause the very large loss of natural resources involved with the present application, I am not prepared to recommend approval of such an alternative." Again, even if approval were given for an alternative plan (which seems most unlikely), there is absolutely no indication it could produce a profit.

The only rational conclusion to be drawn is that the use restrictions preclude petitioners from any economic return on their substantial investment. The matter must be remitted to the commissioner for a decision whether to grant the permit requested or, if he deems the wetlands sufficiently valuable for society's purposes, proceed under the Condemnation Law to acquire title (ECL 24-0705, subd 7).

■ Finally, petitioners contest the legality of the commissioner's regulation (6 NYCRR 662.7 [p]) which requires an applicant for an interim permit to "pay the costs of the public hearing, including the reporter's fees and the costs of the department for two copies of the transcript of the hearing". Unlike the hearing provision (ECL 15-0903, subd 2, par d) under ECL article 15 (Water Resources Law), there is no express statutory authority[6] to impose costs on an applicant for a permit under the Freshwater Wetlands Act. The enactment of the Freshwater Wetlands Act vests the commissioner with the implied authority to recoup from the applicant "necessary expenditures" but not "conveniences to the [agency] for fulfillment of what in the end was its own decision-making responsibility [citations omitted]." *(Jewish Reconstructionalist Synagogue of North Shore v Incorproated Vil. of Roslyn Harbor,* 40 NY2d 158, 165.)

In the *Roslyn Harbor* case, the cost of providing copies of hearing transcripts to the administrative decision-maker (in that case the local zoning board) was specifically held not chargeable to an applicant absent express statutory authority since such are mere "conveniences" to the administrator. *(Roslyn Harbor, supra,* pp 165-166.) Of the $788.43 charged to the applicants herein, $37.50 was for the presence of the stenographer and $744.50 for the preparation of the original transcript plus copies for the agency. The costs of the original stenographic record, the original transcript, and the agency's copies must be born by the agency. Whether the applicants requested their own copy is not clear from the record. If, on remittal, it is found such a request was made, the cost of the additional copy would properly be chargeable to the applicants. The $6.43 in postage fees, being "fairly uniform and predictable" *(Roslyn Harbor, supra,* p 165), may legally be received from the applicants.

The determination should be vacated, with costs, and the matter remitted to the commissioner for a decision, pursuant to ECL 24-0705 (subd 7) whether to grant the permit requested or proceed under the Condemnation Law to acquire title and

---

6. The provision of the State Administrative Procedure Act (§ 302, subd 2) authorizes an agency conducting an adjudication hearing to charge a party *who requests a transcript* for the cost of providing same.

The stenographic transcripts herein were prepared pursuant to 6 NYCRR 662.8 [l] which requires the hearing officer to see that a "complete record of [the] hearing is kept."

for further proceedings regarding the imposition of costs in accordance herewith.

MIKOLL, J. (concurring in part and dissenting in part). Although I agree with the majority insofar as they conclude that the provisions of the regulations concerning the proceedings for the issuance of a permit are not unconstitutional per se, I disagree with them that the denial of a permit to petitioners was irrational and constituted a taking of their property without just compensation.

The commissioner's determination denying petitioners' application for a permit was rationally based on the evidence. The petitioners' evidence was superficial and not buttressed by either expert or documentary proof. In view of the significant questions which petitioners left unanswered and the important ecological and flood control purposes of the Wetlands Act, it was rational to deny the application.

Petitioners further contend that the respondent's determination constitutes a taking without just compensation under ECL 24-0705 (subd 7) and that the commissioner should be directed to decide to either issue the permit or proceed to condemnation. The petitioners contend that the Wetlands Act is a taking statute denying to the owner the reasonable use of their property. The wetlands statute indicates a legislative intent to comply with the standards enunciated by the courts in determining whether a particular land use regulation constitutes a *"de facto* taking"*, and represents an attempt to survive constitutional infirmity by providing for compensation under circumstances which constitute a *"de facto* taking."* ECL 24-0705 (subd 7) reads as follows: "In the event that the court finds the action reviewed constitutes a taking without just compensation, and the land so regulated merits protection under this article, the court may, at the election of the commissioner, either (i) set aside the order or (ii) require the commissioner to proceed under the condemnation law to acquire the wetlands or such less than fee rights therein as have been taken." The terminology of the statute which refers to a taking without just compensation is equivalent to the *"de facto* taking"* test enunciated by the courts.

The general rule is that a governmental exercise of police power is unreasonable and constitutes *"de facto* taking"* when it renders the property unsuitable for any reasonable income productiveness or other private use for which it is adapted and destroys the economic value of all but a bare residue

*(French Investing Co. v City of New York,* 39 NY2d 587). When the restrictions upon the beneficial use and enjoyment of land are necessary to promote the ultimate good of the community and are within the bounds of reason, they will be sustained *(Penn Cent. Transp. Co. v City of New York,* 42 NY2d 324, affd 438 US 104; *Golden v Planning Bd. of Ramapo,* 30 NY2d 359). Once it is demonstrated that the restriction on use of property serves some public purpose, the property owner, in order to sustain an attack on constitutional grounds, must establish that the resulting hardship is such as to deprive him of any use of the property to which it is reasonably adapted or destroys the greater part of its value. Once such a hardship has been established, a *"de facto* taking"* will be determined to have occurred. The same test should be applied to the wetlands statute; that is, whether the regulation as applied to the petitioners has imposed so onerous a burden on property regulated that it has, in effect, deprived the owner of the reasonable income productive or other private use of his property and thus has destroyed its economic value. If that test is met, petitioner may then be entitled to compensation pursuant to the statute (ECL 24-0705, subd 7). This statute successfully meets the constitutional restrictions on land regulation measures because it provides recoupment to the owner when he is required to provide a benefit to the public in a situation where there is a taking without just compensation. On the record before us it cannot be said that petitioners have demonstrated that there was a taking without just compensation. Petitioners have failed to demonstrate that no productive use of their property can be made because of the denial of the present application. Their petition for a permit is uncompromising. They demand full and untrammelled use of their land. Had some expert testimony been presented and test borings been made, it would have been demonstrated to what extent, if any, they could use their land and still remain in conformity with the worthwhile purposes of the statute. The burden of such proof is on petitioners. No owner has an absolute right to change the essential natural character of his land and use it for a purpose unsuited to its natural state, thereby injuring the rights of others *(Sibson v State,* 115 NH 124).

Petition should be denied with leave to reapply for a rehearing in conformity with this opinion.

KANE, STALEY, JR., and LARKIN, JJ., concur with MAHONEY,

P. J.; MIKOLL, J., concurs in part and dissents in part in a separate opinion.

Determination vacated, with costs, and matter remitted to the commissioner for a decision, pursuant to ECL 24-0705 (subd [7]), whether to grant the permit requested or proceed under the Condemnation Law to acquire title and for further proceedings regarding the imposition of costs in accordance herewith.