Bellacosa, J.
(dissenting). I vote to affirm the declaration of facial constitutionality of New York City’s Local Law No. 9— the Single Room Occupancy (SRO) Moratorium Law (Administrative Code of City of New York § 27-198.2).
In 1904, Justice Holmes wrote the quintessential dissenting opinion in Lochner v New York (198 US 45, 74), which presciently warned against his own court declaring unconstitutional an act of the New York State Legislature attempting to limit the working hours of children. The historical, economic, social, legal, policy and constitutional parallels to the facial jettisoning of New York City’s SRO law suggest that it would be far better to harken to that history instead of being condemned to relive it.
Justice Holmes eloquently and cogently sums up the relevancy: "[A] constitution is not intended to embody a particular economic [or property] theory, whether of paternalism and the organic relation of the citizen to the State or of laissez faire. It is made for people of fundamentally differing views * * * General propositions do not decide concrete cases. The decision will depend on a judgment or intuition more subtle than any articulate major premise. * * * I think that the word liberty in the Fourteenth Amendment is perverted when it is held to prevent the natural outcome of a dominant opinion, unless it can be said that a rational and fair man necessarily would admit that the statute proposed would infringe fundamental principles as they have been understood by the traditions of our people and our law. It does not need research to show that no such sweeping condemnation can be passed upon the statute before us” (id., at 75-76 [emphasis added]). Nor on the local law before us either!
*118 Eighty-five years after Lochner, we observe property rights, like the contract rights of that bygone era, being exalted over the Legislature’s assessment of social policy. Like the economic theories underlying Lochner we, as Judges, should not inquire into the wisdom or wholesomeness of SRO’s as shelter for potentially 52,000 new, displaced homeless persons — that policy choice belongs to the elected officials who enacted the law (see, Lochner v New York, supra, at 75; Boreali v Axelrod, 71 NY2d 1, 12).
It would seem fundamental that a law that has no real impact upon a person does not deprive that person of a constitutional right. The majority, however, ignores that the SRO law will have varied affects on different landowners. Perhaps there are properties subject to this law for which SRO operation is the highest and best use. For other SRO operations, 8ü% may be a generous rate of return. It is likely that there are SRO owners who have never intended to further develop or differently develop their property. Of course, these persons are not before the court and, if they were, their interests might well be served by upholding the SRO law. Yet, without a record or the means to assess the differing impacts and with no attempt to make this assessment, the majority holds that Local Law No. 9 facially results in a regulatory taking with respect to every SRO dwelling in the City of New York. Resisting the blanket approach and using the concrete facts of an individual case is not a novel approach, especially in this area of constitutional law (see also, Ward v Rock Against Racism, 491 US —, 109 S Ct 2746).
The legislation enjoys a presumptive threshold of constitutionality. Research reveals no cases in which the Supreme Court or our court have used the regulatory taking theory to undo a legislative act on a facial attack. Also, no precedents in the orbit of this case have previously ventured into the per se physical taking universe to declare a legislative act facially unconstitutional. It could well be that, due to the need to assess the real economic impact of this kind of law upon different property owners before a regulatory taking is decreed, no such doctrine as a facial challenge to a law as a regulatory taking will be recognized. But even if such a proposition is possible, it certainly has not been found to and should not be allowed to be applied against a law such as the challenged one which inherently impacts on widely diverse and different property owners.
*119 The ardently protected economic liberties of property owners to do with their property as they wish, as long as that use does not interfere with the liberty of others to do the same— the shibboleth upon which the dual "taking” analysis is erected in this case — can cut both ways and is therefore not dispositive of this case at this stage. This court has in recent years recognized and approved significant encroachments on the libertarian ideal of property rights against "takings” claims. Property rights are acknowledged justly as not absolute, "for government could not exist if a citizen had the unfettered right to use property” (Rochester Gas & Elec. Corp. v Public Serv. Commn., 71 NY2d 313, 321; see, 41 Kew Gardens Rd. Assocs. v Tyburski, 70 NY2d 325; Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400; Benson Realty Corp. v Beame, 50 NY2d 994; Penn Cent. Transp. Co. v New York City, 42 NY2d 324, affd 438 US 104). These illustrative contrary precedents sink or at least submerge the logic and absolutist constitutional taking analysis advanced to support a reversal in this case.
In the late 1960’s, New York City enacted a policy of utilizing tax abatements to encourage the destruction of SRO’s as substandard housing. When the staggering impact on the homeless population was realized, the City adjusted its policy, recognizing SRO shelter to be a significant component to the preservation of an affordable housing stock (see, Blackburn, Single Room Occupancy in New York City, at 6-7). This court only recently upheld the 1982 repeal of the tax abatement incentives against a Fifth Amendment due process claim by a property owner (Matter of Replan Dev. v Department of Hous. Preservation & Dev., 70 NY2d 451). We noted, with pertinency here, that "the amendment evidences the Legislature’s attempt to preserve what had become recognized as an important but rapidly disappearing source of low-income housing by eliminating the tax incentive to convert SRO’s” (id., at 454-455; see also, Benson Realty Corp. v Beame, 50 NY2d 994, supra).
The repeal of the tax abatements could not alone stanch the decline in the number of SRO units. Responding to the continued trend, the City passed the first SRO moratorium law, a predecessor to Local Law No. 9, on City Council findings "that a serious public emergency exists * * * created by the loss of single room occupancy dwelling units housing lower income persons” (Local Laws, 1985, No. 59 of City of New York § 1). *120 In extending the moratorium in 1986, the City Council added "that there has been widespread withdrawal of single room occupancy dwelling units from the rental market, which has further reduced an already inadequate supply of such units, [and] that this practice has contributed to the increasing homeless population” (Local Laws, 1986, No. 22 of City of New York § 1). A year later, the Council addressed the SRO housing crisis in terms of the increasing homeless population, stating "that adequate housing resources for such occupants do not currently exist; [and] that there is evidence to conclude that the ordinary operation of the real estate market in the city will result in further reduction of such units and that units which have been lost will not be replaced” (Local Laws, 1987, No. 1 of City of New York § 1, amended and reenacted Local Laws, 1987, No. 9).
Local Law No. 9 (Administrative Code § 27-198.2) builds on these emergency legislative initiatives and establishes a renewable five-year moratorium on the demolition or conversion of SRO units. Owners must make SRO dwelling units habitable, may not warehouse them, and must rent them to bona fide tenants (Administrative Code § 27-2151 [a]). Owners may avoid application of the law by showing hardship, buying out or replacing the units (Administrative Code § 27-198.2 [d] [4]). The replacement provision allows demolition or conversion if new units are created through construction, rehabilitation or by buying an existing multiple dwelling. The hardship exemption applies if the property will not produce a reasonable rate of return and the replacement exemption would substantially impair the feasibility of redeveloping the property. A reasonable rate of return is defined as an annual profit equal to 8Vz% of the assessed value of the property. Another ultimate effort at legislatively balancing the respective rights of owners with the critical public interest in low and moderate housing needs allows an owner to obtain an exemption from the local law, by exercising a buyout of units subject to the moratorium. The $45,000 buy-out money must be used to provide substitutive affordable housing.
The rebellion against this careful legislative calibration, and against the Supreme Court and our own court’s admonitions that constitutional takings claims should be resolved on a singularly analyzed, as-applied basis with concrete factual settings, is untenable (see, Pennell v San Jose, 485 US 1, 11-12; Rochester Gas & Elec. Corp. v Public Serv. Commn., 71 NY2d 313, 324, supra). The court should not *121 sweepingly hold that the SRO moratorium law produces both a regulatory and a per se physical taking, facially violative of the United States Constitution.
Enactments of a local law pursuant to NY Constitution, article IX, § 2 (c) (10) and Municipal Home Rule Law § 10 (1) (ii) (a) (12) enjoy a? full presumption of constitutionality. A challenger must prove the legislation unconstitutional beyond a reasonable doubt (41 Kew Gardens Rd. Assocs. v Tyburski, 70 NY2d 325, 333, supra). Additionally, when the challenge is to economic legislation, "modern substantive due process principles require that the judiciary give great deference to the [legislative body]” (Rochester Gas & Elec. Corp. v Public Serv. Commn., 71 NY2d 313, 320, supra, citing Exxon Corp. v Governor of Md., 437 US 117, 124, reh denied sub nom. Shell Oil Co. v Governor of Md., 439 US 884; see, Lincoln Fed. Union v Northwestern Co., 335 US 525; West Coast Hotel Co. v Parrish, 300 US 379; Tribe, American Constitutional Law, at 581 [2d ed]).
Statutes undergoing constitutional challenge as facially invalid in a takings context enjoy even greater deference because there is "an important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation” (Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 494). The Supreme Court routinely rejects preenforcement taking challenges — conceptually and functionally equivalent to facial attacks — to the constitutionality of legislative enactments. Relevantly and bluntly, that court recently rejected a facial challenge to a rent-control law, stating: "we have found it particularly important in takings cases to adhere to our admonition that 'the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary.’ ” (Pennell v San Jose, 485 US 1,10, supra, quoting Hodel v Virginia Surface Min. & Reclamation Assn., 452 US 264, 294-295; see also, Ruckelshaus v Monsanto Co., 467 US 986,1005; Kaiser Aetna v United States, 444 US 164,175, citing Penn Cent. Transp. Co. v New York City, 438 US 104,124, supra.)
The Supreme Court’s "admonition” is particularly pertinent in this case where the declaration of facial unconstitutionality is overinclusive and rooted in a record devoid of specific and relevant facts. The conclusion that the antiwarehousing and *122 rental provisions are a forced occupation, effecting a per se physical taking, contradicts the way high courts have treated their functionally and conceptually equivalent rent-control and regulatory statutes — by repeatedly finding them constitutional, at least facially (see, Pennell v San Jose, 485 US 1, supra; Benson Realty Corp. v Beame, 50 NY2d 994, supra; see also, Nollan v California Coastal Commn., 483 US 825; Loretto v Teleprompter Manhattan CATV Corp., 458 US 419). This contrary holding negates an as-applied analysis which could support findings in appropriate cases that some SRO’s are currently being operated at their highest and best use, thus suffering no economic disadvantage under the law; or that, by reason of the hardship provision, may never be subject to the moratorium. There is no way of knowing on this record the extent to which landlords are economically affected or how profitable the dwelling units might be. Facial constitutional annihilation in such circumstances is a disproportionate remedy.
The majority’s footnote 13 misinterprets what is traditionally referred to as a "facial” challenge and, as such, fails to contend with a real deficiency in its analysis. A facial challenge is an argument that concludes that the law at issue is a taking in all its applications, as to every property within the law’s ambit. Of course there have been preenforcement challenges to laws as regulatory takings as applied to a particular owner’s property, but the majority does not identify even one case that has held that a statute, in all its applications, as to every piece of property affected by the law, works a regulatory taking because it frustrates the planned use for a piece of property. It does not explain how it can hold that the SRO law works a taking wherever the law applies. Yet, the majority concludes that the SRO law is a taking because it subjects properties to a use that owners "neither planned nor desired.” (Majority opn, at 105.) Simply put, the court is without any means in this case to know what every SRO owner "planned or desired”.
Another serious consequence overlooked by the majority is that its facial decree disproportionately demolishes a legislative structure designed to protect those in dire need. It thus legally positions the property owners to seek proportionate "just compensation” from the municipality daring to take, even temporarily, their properties and depriving them of their preferred uses (First Lutheran Church v Los Angeles County, 482 US 304, 321; see, Loretto v Teleprompter Manhattan CATV *123 Corp., 58 NY2d 143, 149, 153, on remand from 458 US 419, supra; see also, Peterson, Land Use Regulatory "Takings” Revisited: The New Supreme Court Approaches, 39 Hastings LJ 335, 337). Thus, ironically, instead of a tax and services burden being shared somewhat equally, one class of property owners may reap a windfall at the expense of all others by the most plenary threshold mechanism. The majority’s decision compensates those from whom nothing is taken at the expense of those who have nothing to give.
In substantive due process inverse condemnation analysis, two distinct tests have evolved; one applicable to physical takings and the other to regulatory types. "A 'taking’ may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good” (Penn Cent. Transp. Co. v New York City, 438 US 104, 124, supra [citations omitted]). Physical invasion cases are special because of the nature and quality of the governmental intrusion on a private party’s property rights. A simple bright line rule applies: "any permanent physical occupation is a taking” (Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 432, supra [emphasis added]). "[W]hen the 'character of the governmental action’ is a permanent physical occupation of property, [the Supreme Court’s] cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner” (id., at 434-435 [emphasis added; citations omitted]; Nollan v California Coastal Commn., 483 US 825, 831, supra; Kaiser Aetna v United States, 444 US 164, 180, supra).
The moratorium law at issue does not effect a physical taking because on its face it is not permanent in its individual application or in its limited five-year duration. As the Supreme Court reminded in Pennell (485 US 1, 12, n 6, supra), "We stated in Loretto v. Teleprompter Manhattan CATV Corp., 458 U. S. 419 (1982), that we have 'consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.’ Id., at 440 (citing, inter alia, Bowles v. Willingham, 321 U. S. 503, 517-518 (1944)). And in FCC v. Florida Power Corp., *124 480 U. S. 245 (1987), we stated that 'statutes regulating the economic relations of landlords and tenants are not per se takings.’ Id., at 252.”
Equally inapplicable is the regulatory taking approach. The concept that "if regulation goes too far it will be recognized as a taking”, now universally accepted in light of modern principles of substantive due process, was accompanied, even in its embryonic stage, with guidelines particularly resonant here: "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts.” (Pennsylvania Coal Co. v Mahon, 260 US 393, 413 [Holmes, J.].) Three important elements from this passage have evolved to become integral parts of regulatory taking analysis: claims should be resolved on concrete facts; the property regulation should substantially advance a legitimate governmental interest; and the owner should not be denied economically viable use of the regulated property (see, Nollan v California Coastal Commn., 483 US 825, 834, supra; Agins v Tiburon, 447 US 255, 260; Penn Cent. Transp. Co. v New York City, 438 US 104, 124, 127, supra; see also, Peterson, Land Use Regulatory "Takings” Revisited: The New Supreme Court Approaches, 39 Hastings LJ 335, 339-351).
No litmus test is available to determine what constitutes a legitimate State interest or what type of nexus "between the regulation and the state interest satisfies the requirement that the former 'substantially advance’ the latter”, but it is clear that "a broad range of governmental purposes and regulations satisfies these requirements” (Nollan v California Coastal Commn., 483 US 825, 834-835, supra; see, Pennell v San Jose, 485 US 1, 108 S Ct 849, supra [affordable housing]; Ruckelshaus v Monsanto Co., 467 US 986, supra [pesticide research and registration]; Andrus v Allard, 444 US 51 [protection of endangered birds]; see also, Matter of Replan Dev. v Department of Hous. Preservation & Dev., 70 NY2d 451, supra *125 [preservation SRO housing stock]; Benson Realty Corp. v Beame, 50 NY2d 994, supra [stable stock of affordable housing]). As long as the law has an identifiable public character, the means by which it is attained is for the legislative body to determine, not the courts (Ruckelshaus v Monsanto Co., 467 US 986, 1014, supra).
There is no disagreement that Local Law No. 9 is of the "greatest societal purpose” because it cannot be seriously disputed that preserving SRO housing stock and stanching the growing ranks of the City’s shelter-less population is a legitimate governmental interest of the highest, most critical order (see, Matter of Replan Dev. v Department of Hous. Preservation & Dev., 70 NY2d 451, 454-455, supra). The SRO moratorium applies a tourniquet to the loss of this part of the housing stock and substantially advances the City Council’s expressed legislative interest of preserving these sheltering units and avoiding a further spillage of homeless into the City’s street population.
When it is clear — as in this case — that a law substantially advances a self-evidently legitimate governmental interest, the test to be applied in considering a facial challenge is simplified: "[a] statute regulating the uses that can be made of property effects a taking if it 'denies an owner economically viable use of his land’ ” (Hodel v Virginia Surface Min. & Reclamation Assn., 452 US 264, 295-296, supra; see, Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 495, supra; Agins v Tiburon, 447 US 255, 260, supra). The SRO moratorium law effects no such deprivation. Indeed, it guarantees a fair minimum return, among a whole host of other economic balancing features. Government regulation almost always limits the maximization of the economic aggrandizement from private property ownership. Local Law No. 9 concededly places substantial restraints on the destruction or redevelopment of SRO buildings. But I would find dispositive of this takings challenge that the law leaves the owners in possession and guarantees them a whole web of economic concessions or "give-backs”, including the minimum profit of 8ti% of the assessed value of the property per year (see, Andrus v Allard, 444 US 51, 65-66, supra).
Appellant owners and some amici argue nevertheless that properties could be put to more profitable uses if their destruction or redevelopment options were unimpeded. The simple answer to that proposition is that a property owner is not *126 constitutionally guaranteed the most profitable use (Andrus v Allard, supra; Penn Cent. Transp. Co. v New York City, 438 US 104, 125, supra). In determining whether regulations over property deprive the owner of the economically viable use of the land, we have required proof "by 'dollars and cents’ evidence that under no use permitted by the regulation under attack would the properties be capable of producing a reasonable return; the economic value, or all but a bare residue of the economic value, of the parcels must have been destroyed” (de St. Aubin v Flacke, 68 NY2d 66, 77; see, Penn Cent. Transp. Co. v City of New York, 42 NY2d 324, 329-331, affd 438 US 104, supra; French Investing Co. v City of New York, 39 NY2d 587, 596, appeal dismissed 429 US 990). That standard can be properly ventilated and applied only in administrative and judicial forums on an as-applied case record development — not in an aerie perch on a facial review.
The loss of future profits argument also "provides a slender reed upon which to rest a takings claim. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests” (Andrus v Allard, 444 US 51, 66, supra). Insofar as the case presents a facial attack, there is absolutely no record basis against which to determine whether the moratorium law interferes with distinct "investment-backed expectations” (see, Penn Cent. Transp. Co. v New York City, 438 US 104, 124, supra).
Peripherally, the court also decides today that one particular known person may not be ousted from his habitation because that would violate a legislated antieviction policy in a rent-control situation (Braschi v Stahl Assocs. Co., 74 NY2d 201 [decided today]). To be sure, the statutes and the issues have some differences, but they have one essential feature in common: Local Law No. 9’s genesis and purpose are founded in the identical social policy as the antieviction regulation — securing shelter for people — only in the instant case the statute tries to protect the most disadvantaged members of our society who truly have no where else to go. The court, contradictorily in my view, authorizes the expulsion of 52,000 people to allow, in the main, for commercial redevelopment of their former less-than-modest dwellings while keeping one known individual in his rent-controlled apartment. The decisional compass seems to be oscillating between opposite poles.
*127 In sum, the Constitution, the authorities and the policies do not support the conclusion that the legislated emergency moratorium against the elimination of SRO dwelling units, societally critical to the temporary preservation of some housing for low-income persons, is a facially impermissible governmental taking, i.e., an inverse condemnation of property. The precedents of the Supreme Court and of our court, properly applied and understood, do not warrant the grave judicial usurpation effected today in the declaration of facial unconstitutionality of an enactment by a duly elected democratic body —a declaration which gives modern intonation to Judge Cardozo’s disquieting observation that: "Judges march at times to pitiless conclusions under the prod of a[8] remorseless logic which is supposed to leave them no alternative. They deplore the sacrificial rite. They perform it, nonetheless, with averted gaze, convinced as they plunge the knife that they obey the bidding of their office. The victim is offered up to the gods of jurisprudence on the altar of regularity” (Cardozo, Growth of the Law, at 66).
Judges Simons, Kaye, Alexander and Titone concur with Judge Hancock, Jr.; Judge Bellacosa dissents and votes to affirm in a separate opinion in which Chief Judge Wachtler concurs.
Order reversed, with costs, Local Law No. 9 declared to be unconstitutional and defendants enjoined from implementing the local law’s provisions.