OPINION OF THE COURT
Charles A. Kuffner, J.
This is a special proceeding in which the petitioners seek a judgment pursuant to CPLR article 78: (1) annulling a cease and desist order issued by the respondent, Department of Environmental Conservation (hereinafter the DEC); (2) determining that petitioners’ property is not a wetland as defined in ECL article 24; (3) preventing the Department of Environmental Conservation from further interference with construction on petitioners’ property, or alternatively, requiring it to commence condemnation proceedings.
The petitioners are in the process of constructing a home on their property at the corner of Stevenson Place and South Goff Avenue, Staten Island, New York. On October 21, 1985, the DEC sent a letter to petitioners’ counsel directing that all *110 activities, including clearing and filling of the property, cease and desist.
The issue before the court, although not directly raised by the parties, is whether the DEC has jurisdiction over petitioners’ property. If it does, then it may enforce ECL article 24 as it pertains to this parcel, by requiring permits to conduct regulated activities (ECL 24-0701 [2]) by imposing civil penalties and cease and desist orders (ECL 71-2303) and by seeking judicial enforcement (ECL 71-2305). If not, the Department of Environmental Conservation has no jurisdiction over petitioners’ property to enforce the Freshwater Wetlands Act.
A freshwater wetlands is land and water within the State as shown on the freshwater wetlands map (ECL 24-0107 [1]). Thus, if the land or water in question is not shown on the freshwater wetlands map, it is not a freshwater wetlands by definition. Nonfreshwater wetlands are not regulated by the Act.
What is a freshwater wetlands map? It is a map promulgated by the DEC pursuant to ECL 24-0301 on which are indicated the boundaries of any freshwater wetlands (ECL 24-0107 [2]). An integral part of the promulgation procedure is the filing and availability for public inspection of the boundary maps at the DEC’s regional office and in the office of the clerk of each county in which such wetlands are located (ECL 24-0301 [6]). These maps shall be made available for public inspection, and the use of the word "shall”, as used in subdivision (6), is ordinarily mandatory in nature. (People v Gowasky, 244 NY 451, 466; People v Ricken, 29 AD2d 192.) There is no other qualifying language in the statute indicating some other meaning. (Matter of Mulligan v Murphy, 19 AD2d 218, 223.)
ECL 24-0301 contains an elaborate scheme for promulgation of freshwater wetlands maps. The Commissioner of the Department is directed to conduct a study to identify and map freshwater wetlands within the State. Those wetlands he identifies constitute this State’s wetlands inventory. Upon completion of the inventory, the Commissioner is directed to prepare a tentative freshwater wetlands map delineating the boundaries of such wetlands as determined by the aforementioned study and inventory. Subdivision (6) requires these boundary maps to be available to the public for inspection and examination at a regional DEC office and in the office of the County Clerk in each county in which an affected wetland is located.
*111 The court has determined, on its own investigation, that only one such tentative map has been filed in the Office of the Clerk of Richmond County on March 30, 1981. This map (actually, it is one map consisting of several sections, but they were filed together) delineated several wetlands areas throughout Richmond County. No other maps have ever been filed in the Office of the County Clerk of Richmond County. Petitioners’ property is not designated as a wetland area on this map. Thus, as of the time of the filing of this tentative map, the subject property was not a freshwater wetland, and any attempt to regulate land not shown on such map is in excess of authority granted by the act. (People v Bondi, 104 Misc 2d 627.)
The Legislature recognized that changed conditions might necessitate readjustment of the tentative maps (and for that matter, the final maps). Subdivision (6) gives the Commissioner the authority to readjust the boundary maps so filed, in order to clarify the boundaries of the wetlands, to correct any error, to effect any additions, deletions, or technical changes on the map and to reflect any natural changes or changes which have occurred as a result of the granting of any permits. However, the power to readjust the maps is not unlimited. The Commissioner may not arbitrarily and unilaterally readjust the tentative maps without violating procedural due process rights of property owners.
When this act is applied to one’s property, both the use of the property and its value are in serious jeopardy. The regulated activities are many (ECL 24-0701 [2]), and include draining, dredging, excavation, removal of soil, mud, sand shells and gravel; also included are dumping, filling, depositing of soil, stones, sand gravel, mud, rubbish and the erection of any structures, roads, pilings, obstructions, septic tanks, sewers, and the discharge of any sewage treatment effluent. These activities are so far ranging in scope that it is safe to assume that any reasonable development or use of the land is precluded in the absence of a permit. If reasonable development is prohibited, the value of the property on the open market is surely impaired.
This act is a form of zoning regulation. In fact, it requires the Commissioner to promulgate land use regulations upon completion of the wetlands map. (ECL 24-0903.) These regulations must classify each wetland according to their most appropriate uses, and he shall prepare minimum land use *112 regulations to permit only those uses compatible with their wetlands characteristics. These regulations have a potential to deprive one of the use and enjoyment of property unreasonably, and therefore constitutional due process protections must be afforded. (French Investing Co. v City of New York, 39 NY2d 587, cert denied 429 US 990; see also, Matter of Seidner v Town of Islip, 56 NY2d 1004.) Without a permit, the property will be rendered unsuitable for any reasonable income production or other private use for which it is adapted. Thus, the economic value will be destroyed if only a base residue of that value remains (French Investing Co. v City of New York, supra, at p 596, and cases cited therein). Placing the bulk of one’s property on a map which respondents have attempted to do, and which results in an inability to sell or deprives the owner of a substantial use of property can constitute a taking without due process of law (Jensen v City of New York, 42 NY2d 1079).
This is not to say that the actions of the respondents have already effectuated a deprivation of the reasonable use of petitioners’ property at this point in time. In order to have standing to challenge the validity of the ordinance or regulation, petitioners will have to apply for, and be denied, a permit from the DEC. (Matter of Pichel v Wells, 38 AD2d 632.) This court is not passing on the issue of whether petitioners’ property has been "taken” by the State as a result of respondents’ actions. The only issue determined by this court is whether the DEC has jurisdiction over the property in light of its failure to afford minimal procedural due process protections afforded by the Environmental Conservation Law.
In addition, this is not to say that DEC cannot act in furtherance of a legitimate State interest in protecting freshwater wetlands. It cannot act without affording some sort of procedural due process. In this regard, due process means, at a minimum, notice and an opportunity to be heard. (Goldberg v Kelly, 397 US 254; Bradford Audio Corp. v Pious, 392 F2d 67; Bronson v Consolidated Edison Co., 350 F Supp 443; Matter of Jones v Berman, 37 NY2d 42; Harris v Wyman, 42 AD2d 27; Oberlander v Perales, 740 F2d 116.)
The Legislature, perhaps recognizing that due process problems would arise if the DEC could readjust the maps without affording affected persons an opportunity to be heard, requires a certain procedure before a readjustment of any boundary map may be made. A tentative map is a "boundary map” as contemplated by ECL 24-0301 (6), since a tentative map must *113 set forth the boundaries of designated wetlands (ECL 24-0301 [3]). ECL 24-0301 (6) requires that "[n]otice of such readjustment shall be given in the same manner as set forth in subdivision five of this section [ECL 24-0301] for the promulgation of final freshwater wetlands maps.” Subdivision (5), in turn, states in pertinent part: "After considering the testimony given at such hearing [emphasis added] and any other facts which may be deemed pertinent, after considering the rights of affected property owners and the ecological balance in accordance with the policy and purposes of this article * * * the commissioner shall promulgate by order the final freshwater wetlands map. Such order shall not be promulgated less than sixty days from the date of the hearing required by subdivision four hereof. A copy of the order, together with a copy of such map or relevant portion thereof shall be filed in the office of the clerk of each local government in which each such wetland or a portion thereof is located [emphasis added] * * * The commissioner shall simultaneously give notice of such order to each owner of lands, as shown on the latest completed tax assessment rolls, designated as such wetlands by mailing a copy of such order to such owner by certified mail in any case where a notice by certified mail was not sent pursuant to subdivision four hereof, and in all other cases by first class mail. The commissioner shall also give notice of such order at such time to the chief administrative officer of each local government within the boundaries of which any such wetland or a portion thereof is located. At the time of filing with such clerk or clerks, the commissioner shall also cause a copy of such order to be published in at least two newspapers having general circulation in the area where such wetlands are located.”
The hearing referred to in subdivision (5) is, in turn, referred to in subdivision (4). It states in pertinent part: "Upon completion of the tentative freshwater wetlands map for a particular area, the commissioner or his designated hearing officer shall hold a public hearing in that area in order to afford an opportunity for any person to propose additions or deletions from such map. The commissioner shall give notice of such hearing to each owner of record as shown on the latest completed tax assessment rolls, of lands designated as such wetlands as shown on said map and also to the chief administrative officer and clerk of each local government within the boundaries of which any such wetland or a portion there is located * * * by certified mail not less than thirty days prior *114 to the date set for such hearing and shall assure that a copy of the relevant map is available for public inspection at a convenient location in such local government. The commissioner shall also cause notice of such hearing to be published at least once, not more than thirty days nor fewer than ten days before the date set for such hearing, in at least two newspapers having general circulation in the area where such wetlands are located.”
Consequently, when ECL 24-0301 (3), (4), (5) and (6) are read together as well as ECL 24-0107 (1) and (2), it is clear that a public hearing with certain designated notice thereof by the DEC is required whenever it wishes to make changes in either a tentative freshwater wetlands map filed with the County Clerk, or a final freshwater wetlands map. This interpretation is rational and reasonable under the circumstances, because the Legislature has made it clear that the public must be afforded a meaningful forum and an opportunity to be heard before any land located within the State is designated as wetlands. In essence, the DEC is creating a new map when it changes a previously filed map, and persons affected by those changes are entitled to some form of input into those decisions in order to satisfy minimal due process.
Again, it must be remembered that the above-cited subdivisions are not designed as an emasculation of the DEC’s power to readjust the maps that it files. They are intended as a reasonable limitation on any arbitrary or capricious action by the State in designating heretofore unregulated, privately owned property as protected wetlands.
It is clear from reading these subdivisions that such was the intention of the Legislature. The function of the court is to carry out that intention and put it into effect. (Sharkey v Thurston, 268 NY 123; Matter of Jannicky, 209 NY 413; Matter of Huntington, 168 NY 399; Matter of Carr v New York State Bd. of Elections, 40 NY2d 556; Baldine v Gomulka, 61 AD2d 419, lv dismissed 45 NY2d 818.) The court must look to the enactment as a whole, and should give the words a meaning which serves, rather than defeats, the ends intended by the Legislature. (MVAIC v Eisenberg, 18 NY2d 1; Matter of Allcity Ins. Co. [Kondak], 66 AD2d 531.)
This statute, being in the nature of a zoning ordinance, and in derogation of the common law (People v Bondi, 104 Misc 2d 627, supra) must be strictly construed. (Gibbs v Arras Bros., 222 NY 332; Abrams v Schwartz Co., 7 Misc 2d 635; Thomson *115 Indus, v Incorporated Vil. of Port Wash. N., 27 NY2d 537.) All other factors being equal, this strict construction should be in favor of the property owner, where the statute is in derogation of common-law property rights. (Matter of Alfie’s Fish & Chips v Zoning Bd. of Appeals, 36 AD2d 664.) In Alfie’s Fish & Chips, a zoning ordinance provided that every amendment and map incorporated therein shall be entered in the minutes of the city council and published and posted. The court held that petitioner, a property owner, was not required to use and rely on an unofficial map not promulgated pursuant to the ordinance, notwithstanding the intent of the city’s council to change the zoning from business to residential.
This court is aware of the holding by the Third Department in Matter of Tri Cities Indus. Park v Commissioner of Dept. of Envtl. Conservation (76 AD2d 232). A cursory reading of that decision would seem to indicate that the DEC has broad jurisdiction to proscribe certain activity on property it deems to be wetland for the entire period prior to promulgation of a final map. A closer reading reveals a clear distinction between Tri Cities and the case at bar. In Tri Cities, no tentative map had been filed. The DEC was still in the "inventorying” stage (ECL 24-0301 [1]). Consequently, the Third Department never addressed the issue of how a filed tentative map can be changed, amended, etc., and it remains unresolved by the Tri Cities decision.
Therefore, this court holds that where a tentative map has been filed with a County Clerk, the DEC has no jurisdiction over any lands or waters within the territory affected by such map unless it appears, and is clearly marked as such, as a freshwater wetland on that map. Of course, if the tentative map has been corrected, amended, changed, etc., after proper notice and a public hearing, and a readjusted map has been filed with the County Clerk, then the lands and waters indicated on such readjusted map come under DEC jurisdiction.
In the case at bar, only one tentative map has been filed in the Office of the County Clerk in Richmond County, and petitioners’ property is not designated as a freshwater wetland thereon. Consequently, the court holds that petitioners’ property is not subject to any regulation by the DEC until such time as that agency files a properly readjusted map as indicated hereinabove.
It has been known to be a common practice by the DEC to attempt to designate lands on Staten Island on a piecemeal *116 basis. A common scenario is as follows: An owner of vacant property decides to develop it in some way, usually by building a residence. The bulldozers arrive, and begin excavation and/or fill work, as needed. Adjoining property owners then complain to the DEC, which sends down an employee to investigate the situation. He inspects the area, finds some characteristics of a freshwater wetland existing at the site (ECL 24-0107 [1] [a]), and reports such findings to his superiors. The DEC then unilaterally designates the area as a freshwater wetland, and so notifies the owner together with a cease and desist order.
Under this procedure, a property owner has no way of ascertaining whether his property shall be subject to wetland regulation until expenditures are made and work has actually commenced. A prospective property owner has no way of ascertaining whether his intended purchase is subject to regulation by the DEC until substantial expenditures for architects, engineers, attorneys, etc., have been made. By way of contrast, there are ways to acquire all other information necessary to ascertain the best use of the property, such as zoning restrictions, set-back restrictions, sewerage facilities, easements, liens, encumbrances, required frontage, height restrictions, square footage ratios, etc., by searching public records and documents. But not so vis-á-vis freshwater wetland regulation.
It is true that any person may inquire of the DEC as to whether any given parcel is, or will be, designated as a wetland subject to regulation. (ECL 24-0703 [5].) But even in the face of a negative response by the DEC, the property owner (or prospective owner) still cannot be certain as to whether or not the DEC will attempt to exercise jurisdiction over a given parcel. (See, Matter of Waterside Assoc. v New York State Dept. of Envtl. Conservation, 130 Misc 2d 951.)
The Freshwater Wetlands Act became effective on September 1, 1975. Ten years have passed and no final freshwater wetlands map has been promulgated. Instead, the DEC has operated on a piecemeal basis, preparing tentative maps and inventorying freshwater wetlands of this State in phlegmatic fashion. This approach is contrary to the stated intentions of both the Legislature and the Governor in approving the act. The act itself directs the Commissioner to conduct his study of the State’s freshwater wetlands as soon as practicable, and the study is subject to completion in an expeditious fashion. (ECL 24-0301 [1].) The Governor, in approving the enacting bill, *117 anticipated that the study would be conducted quickly, for he stated that a permit from the DEC would be required to alter a freshwater wetland "[a]fter issuance of the official freshwater wetlands map” (Governor’s memorandum, Aug. 1, 1975, 1975 McKinney’s Session Laws of NY, at 1763). Certainly, the Governor could not have anticipated that 10 years would pass without promulgation of a final map. Greater achievements have been accomplished in less time.
If the Department of Environmental Conservation wishes to administer the Freshwater Wetlands Act as it was intended, it must proceed to promulgate the final map with greater earnest than it has in the past.
This petition is granted to the following extent:
1) the Department of Environmental Conservation’s cease and desist order dated October 21, 1985 is vacated and annulled;
2) the petitioners’ property is not subject to Department of Environmental Conservation’s jurisdiction and enforcement;
3) petitioners may proceed to develop the subject property without Department of Environmental Conservation approval or permit, subject, of course, to any other approvals or permits by other agencies having jurisdiction.